Thomas S. **KEDZIORA** and Merrilou Kedziora, Plaintiffs,

v.

**CITICORP NATIONAL SERVICES, INC.,** Citicorp Acceptance Company, Inc., and Citicorp, Defendants.

No. 91 C 3428.

United States District Court, N.D. Illinois, E.D.

Nov. 21, 1991.

Donald Rendler–Kaplan, Daniel Edelman, Lawrence Walner, Chicago, Ill., for plaintiffs.

Alan N. Salpeter, Lynne M. Raimondo, Jeffrey S. Kinsler, Victoria R. Collado, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Thomas and Merrilou Kedziora ("Kedzioras") have sued Citicorp National Services, Inc. ("Citicorp National") and its subsidiaries Citicorp Acceptance Company, Inc. and Citicorp (all three corporations are collectively referred to in this opinion as "Citicorp," treated for convenience as a singular noun)[1], claiming that automobile leases issued by Citicorp violated the Consumer Leasing Act, 15 U.S.C. §§ 1667–1667e (the "Act")[2] and its implementing regulations as well as Illinois law. Jurisdiction is grounded in 28 U.S.C. § 1331 and in this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

Citicorp has moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the Complaint. For the reasons discussed in this memorandum opinion and order, the motion (1) is granted as to Counts II and III and (2) is granted in part and denied in part as to Counts I, IV and V.

1. Citicorp National has filed a motion to dismiss for lack of jurisdiction. It claims that the corporate veil protects it from any liability for the actions of its subsidiaries. By agreement the parties have put off briefing that motion until the present motion to dismiss is decided. "Citicorp" is used here without prejudice to Citicorp National's jurisdictional claim.

2. Further citations to provisions of Title 15, whether or not part of the Act, will take the form "Section—."

3. Rule 12(b)(6) principles require this Court to accept as true all of the Complaint's well-pleaded factual allegations, drawing all reasonable inferences in Kedzioras' favor (*Marmon Group,*

## ALLEGATIONS OF THE COMPLAINT [3]

Kedzioras incurred a substantial "termination charge" when they defaulted on their 60–month car lease ("Lease") after 22 months. Insurance proceeds paid the bulk of the charge, but a balance remained due for which Kedzioras were personally liable. Rather than pay the balance, Kedzioras brought suit to challenge the validity of certain of the Lease terms.

Kedzioras assert five claims in the class action suit that they initially filed in the Circuit Court of Cook County.[4] Count I contends that the termination charge was "unreasonable" and therefore a violation of the Act. Count II says that Citicorp had failed to disclose adequately the termination charges required by the lease, also in violation of the Act. Count III asserts that Citicorp's failure to disclose the purchase option price at the end of the lease term also violated the Act. Count IV states that the default and early termination charges constitute unenforceable penalties in violation of Illinois common law. Count V alleges that the termination charges and inadequate disclosure constituted unfair and deceptive business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.St. ch. 121½, ¶¶ 261–272.

Citicorp removed the case to federal court pursuant to 28 U.S.C. § 1446. It then filed its motion to dismiss in lieu of an answer, and the parties have briefed the motion at length.

*Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir. 1987)).

4. Kedzioras advance all the claims save Count III as class action claims. Their class allegations have no bearing on the present motion, and this Court offers no judgment or comment on the likelihood of class certification (an issue that must be addressed promptly under Rule 23, and that this Court expects the parties to turn to next). Kedzioras seek various remedies, including a refund of all improper charges, statutory damages for the federal claims per Section 1640, and injunctive relief for the state claims. As with the class issues, no discussion of remedies is required at this stage of the case.

CONSUMER LEASING ACT

Congress has enacted a broad-based regulatory scheme to govern the consumer credit industry (Sections 1601–1693r). As a whole that scheme is commonly known as the Truth in Lending Act ("TILA"), while the sections applicable to consumer leases (Sections 1667–1667e) are known as the Consumer Leasing Act. In passing the Act Congress sought (Section 1601(b)):

> to assure meaningful disclosure of the terms of leases of personal property for personal, family, or household purposes so as to enable the lessees to compare more readily the various lease terms available to him, limit balloon payments in consumer leasing, enable comparison of lease terms with credit terms where appropriate, and to assure meaningful and accurate disclosures of lease terms in advertisements.

TILA's damage provisions (Section 1640) are made applicable to claims under the Act as well (by Section 1667d). Definitions under TILA (Section 1602) naturally apply to the Act, for Congress chose to embed the Act within the TILA structure. For the same reason, general rules of construction applicable in TILA cases must also apply in cases under the Act. Courts have consistently held that TILA must be liberally construed in the consumer's favor (see, e.g., *Pearson v. Easy Living, Inc.*, 534 F.Supp. 884, 890 (S.D.Ohio 1981)) and that even the most technical disclosure violations—whether or not they cause actual damage or deception—may trigger liability for the offending creditor (*Smith v. No. 2 Galesburg Crown Finance Corp.*, 615 F.2d 407, 416–17 (7th Cir.1980)).

On the other hand, *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980) (emphasis and brackets in original), quoting S.Rep. 96–73, p. 3 (1979), has stressed:

> *Meaningful* disclosure does not necessarily mean *more* disclosure. Rather, it describes a balance between "competing considerations of complete disclosure ...

and the need to avoid ... [informational overload]."

That principle too must apply to the Act.

Two provisions of the Act supply the grounds for Kedzioras' federal claims. First is the provision mandating "clear and conspicuous" disclosure (Section 1667a) of various lease terms, including "the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination" (Section 1667a(11)). Second is the provision governing liability on expiration or termination of a lease, which mandates in part (Section 1667b(b)):

> Penalties or other charges for delinquency, default, or early termination may be specified in the lease but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the delinquency, default, or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an inadequate remedy.

Congress here very nearly copied the exact language of the Uniform Commercial Code and the Restatement (Second) of Contracts (1981) on liquidated damages (see Ill.Rev.Stat. ch. 26, § 2–718(1); Restatement § 356(1)). Legislative history informs us that the resemblance to the UCC was intentional (S.Rep. No. 94–590, 94th Cong., 2d Sess. 7, 1976 U.S.Code Cong. & Admin.News 431 at 437 says "The language is taken from the Uniform Commercial Code's provision on liquidated damages, and should be applied flexibly"). By logical extension, then, Congress must have intended that any settled judicial interpretation of the UCC and the Restatement should govern the interpretation of Section 1667b(b). At any rate, the remainder of the statute and the implementing regulations shed no light on Section 1667b(b), so that the UCC and the Restatement are the only logical tools with which to give content to the amorphous term "reasonable."

By referring to "anticipated or actual" harm, then, Congress surely intended that courts should look to the Restatement's

perspective on the identical terms—a perspective that stresses temporal considerations of reasonableness. Liquidated damages clauses are to be upheld if they provided a reasonable estimate as of the time of contracting *or* if they in fact turn out to provide a reasonable approximation of actual damages (*Yockey v. Horn*, 880 F.2d 945, 952–54 (7th Cir.1989)). In other words, a liquidated damages clause that may in a particular case happen to produce damages far out of proportion to demonstrable actual damages is still valid as long as it was reasonable ex ante.

Implementing regulations issued by the Federal Reserve (12 C.F.R. § 226.1 et seq., commonly known as "Regulation Z," and 12 C.F.R. § 213, commonly known as "Regulation M"[5]) give further definition to the statutory requirements just outlined. Those regulations, and additional elements of the statutory scheme relevant to the case, are touched on below.

As the passages quoted earlier indicate, Section 1667b imposes substantive requirements of reasonableness on termination penalties or other charges, whereas Section 1667a imposes no substantive requirements on lease terms. Instead it merely requires adequate disclosure of the terms.

### CITICORP'S LEASE TERMS

Kedzioras leased a 1989 Pontiac Grand Prix from Citicorp on September 1, 1988. Over the course of the 60–month lease they were to pay Citicorp a total of $16,727.40. On August 19, 1990 the Grand Prix was demolished in an accident. Because the accident damaged the leased vehicle "beyond reasonable repair," it had the effect of triggering a default under Kedzioras' lease with Citicorp (Lease ¶ 8). Kedzioras thus became obligated to pay Citicorp a termination charge with five components (Lease ¶ 17):

    (a) all unpaid amounts due at the time of termination;

    (b) all remaining monthly payments, "reduced by the unearned amount of the Lease Charge [in effect the total interest

payment over the 5–year term of the lease, specified in Lease ¶ 28(a) to be $6,206.40] determined by the Sum-of-the-Digits method, and by the total amount of any sales, use or rental tax ... for those monthly payments";

    (c) a "disposition charge," specified in Lease ¶ 27 to be $300;

    (d) the estimated end-of-term wholesale value of the vehicle, specified in Lease ¶ 28(b) to be $6,362; and

    (e) any government fees and taxes related to the early termination.

That formulation produced a termination charge of $12,994.14. Kedzioras received an insurance payment of $10,360, which they turned over to Citicorp, leaving a balance of $2,688.14 for which Kedzioras were personally liable. Lease ¶ 17 obligated Citicorp to sell the vehicle "at wholesale or retail, as you [Citicorp] determine," and to reduce the termination charge by the amount of the sale price. Because Citicorp could not of course sell a destroyed vehicle, that offset was provided by the insurance proceeds instead.

Various other provisions of the Lease bear on Kedzioras' claims. However, it is probably more meaningful to recount those provisions in the context of the discussion that follows, rather than prolong this preliminary description of the Lease in the abstract.

### Count I: Unreasonable Termination Charges

Kedzioras claim that five aspects of the termination charge are not "reasonable" within the meaning of Section 1667b. This opinion will deal with each of them in turn.

■ *1. Liability for default within first 12 months.* Had Kedzioras defaulted within the first 12 months of their lease, rather than in the 24th month as they did, Citicorp would have calculated termination charges in a slightly different way (Lease ¶ 16). Kedzioras would have had to pay 100% of the first 12 lease payments. For instance, if they had defaulted after mak-

5. All citations to those Regulations in this opinion will take the form "Reg. M § —" and "Reg. Z § —," omitting (just for convenience) the always-applicable reference to 12 C.F.R.

ing three monthly payments, they would have owed nine times the full monthly cost, with no discount of that figure for the unearned finance charge. In all other respects the termination formula would have been the same as described earlier and as actually applied in this case. In particular, Kedzioras would also have had to pay an amount covering the remaining 48 monthly payments, but as to those payments Citicorp would have applied a discount for the unearned finance charge. Citicorp also would have had to reduce Kedzioras' liability by the amount of the vehicle's resale price.

Kedzioras maintain that the pre–12–months formula is unreasonable because it imposes extremely high costs on a lessee who returns a nearly-new car to the finance company.[6] Discounting to present value is widely recognized as an essential element of enforceable liquidated damages provisions in general (see, e.g., this Court's opinion in *Heller Financial, Inc. v. Burry*, 633 F.Supp. 706, 707 (N.D.Ill.1986); *United Leasing & Financial Services, Inc. v. R.F. Optical, Inc.*, 103 Wis.2d 488, 309 N.W.2d 23, 27 (Wis.App.1981)) and in the context of accelerated auto lease payments in particular (*Moore v. Ford Motor Credit Co.*, 778 S.W.2d 657, 659 (Ky.App.1989); *Adams v. D & D Leasing Co. of Georgia*, 191 Ga. App. 121, 381 S.E.2d 94, 96 (1989)). Lease provisions that require acceleration without reduction to present value invariably shift the time value of future payments from lessee to lessor. And any formula that is *guaranteed* to produce greater than actual damages necessarily results in an unenforceable penalty rather than a valid assessment of liquidated damages (*Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir.1985)[7]).

Citicorp, however, insists that the pre–12–months formula is reasonable as a matter of law. Almost as an afterthought to its substantive arguments, its R.Mem. 6 adds that Kedzioras should not obtain relief based on "hypothetical fact patterns unrelated to the circumstances of this case." Kedzioras terminated in the 24th month of their lease, so that the pre–12–months formula obviously played no part in determining their liability. That being so, this Court cannot reach the merits of this aspect of the parties' quarrel because Kedzioras lack standing to litigate that aspect of the Lease.

Courts have consistently held that the ordinary principle of "no harm, no foul" does not limit the availability of TILA remedies under Section 1640. No proof of actual damage or deception is required to obtain relief (*Smith*, 615 F.2d at 416–17). That broad approach to standing furthers the broad remedial purposes of TILA by empowering anybody who signs a lease to recover upon proof of nondisclosure in violation of the statute, whether or not the particular nondisclosure produced a demonstrable injury (*Brown v. Marquette Savings & Loan Ass'n*, 686 F.2d 608, 614 (7th Cir.1982); see also *Williams v. Public Finance Corp.*, 598 F.2d 349, 355 (5th Cir. 1979) (redress of injuries *and* deterrence are statutory goals)).

As said earlier in this opinion, Congress specified that the TILA remedial scheme should apply to consumer leasing cases under the Act (Section 1667d(a), incorporating Section 1640). Kedzioras in effect argue that Congress embedded within the Act the *entire* TILA remedial scheme, including the broad approach to standing. Thus they claim standing to contest the reasonableness of a Lease provision under Section 1667b(b) even though the provision had not the slightest effect upon them—not because there was no demonstrable harm from a provision that actually *applied* to them, but rather because the provision did *not* apply to them at all. That notion

---

**6.** Failure to discount the first 12 payments to present value appears to be the only material difference between the pre–12–months formula and the formula actually applied. Therefore the failure to discount is the only issue considered in this section of the opinion. Sections that follow will take up other aspects of the damage formula.

**7.** *Lake River* announces that proposition as a matter of Illinois law, but this Court perceives no reason to limit its applicability. More on this subject later.

seems extraordinarily problematic in Article III "case or controversy" terms, but that need not ultimately be decided because Kedzioras' contention must be rejected as a matter of statutory application.

TILA is fundamentally a disclosure statute. It imposes no substantive requirements of reasonableness in lending or leasing. To require proof of actual damages in a nondisclosure case under Section 1640 would ill-serve the statute's fundamental purpose of "assur[ing] meaningful disclosure" so that consumers may comparison-shop for credit in a meaningful way (Section 1601(a)). What plaintiff could ever hope to prove that his or her injuries *resulted* from a particular nondisclosure? [8] Nondisclosure is too slippery a beast to capture through more traditional notions of legal harm. Because no single nondisclosure is readily defined as the source of an injury, courts that interpret TILA basically indulge the presumption that *every* nondisclosure in violation of law is the source of an injury: the violation of the statutory right to full information. As *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (citation omitted) said in a different context:

> The actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing...."

Part of the Act—its Section 1667a—performs a virtually identical information-compelling function to the disclosure provisions of TILA. When Congress passed the Act it included a statement of purpose (Section 1601(b)) virtually identical to the statement of purpose under TILA (Section 1601(a)). Identical injury requirements therefore ought to apply under both those statutes.

But that rationale does not logically extend to claims of substantive unreasonableness under Section 1667b(b). Injuries that flow from the unreasonableness of a particular lease provision are far easier to define than injuries from nondisclosure. Any plaintiff injured by specific lease provisions can reasonably be expected to recognize the source of his or her harm and litigate accordingly. Kedzioras' own complaint illustrates that truth: Apart from their arbitrarily-imported objection to the pre–12–months formula, they have sued over various other lease provisions that *did* actually figure in the calculation of their liability. Where injury is so readily defined and so likely to be litigated, there is no reason to think that Congress meant to apply anything but the traditional concept of injury-in-fact to the plaintiff that is necessary to create an Article III case or controversy (*Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.*, 454 U.S. 464, 486, 102 S.Ct. 752, 766, 70 L.Ed.2d 700 (1982)).

Moreover, this opinion has already observed that Congress essentially used the language of the common law of contracts in Section 1667b(b). At common law a plaintiff cannot sue to recover damages under a contract because it contained a separable unenforceable provision that has no applicability in his or her own case. Common-law notions of actual damage therefore ought to apply.

To reiterate: What Kedzioras are trying to do here is to get out of a lease. To do so they have combed through their Lease in search of unlawful provisions: unlawful because they are unreasonable or undisclosed. Any and all undisclosed provisions may create an Article III injury. But arguably unreasonable provisions create no in-

---

**8.** Similar standards control in the securities context, where the courts are also motivated by the need to enforce Congress' broad remedial goals. Materiality of nondisclosure under Rule 10b–5 is tested by the standards of the "reasonable investor" (*Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)), so that a plaintiff is not called upon to show that his or her own subjective investment decisions would have been affected by disclosure of the disputed information in order to recover. Any less lenient standard would tend to defeat the information-forcing function of the securities laws. Courts seek to prevent inadequate or misleading disclosures because they constitute a "fraud on the market" that distorts the price of securities (*id.* at 247, 108 S.Ct. at 991). Similarly, courts applying TILA seek to force disclosure of adequate and accurate information about credit, in the hope of creating or maintaining a well-functioning market.

jury unless they actually figure in the calculation of "penalties or other charges" as applied to Kedzioras. If the pre–12–months formula had been undisclosed, Kedzioras could litigate that nondisclosure because it could arguably have entered into their contracting decision—but they cannot litigate a disclosed provision that had no impact whatever on them, just on the basis that it would have been unreasonable as to some hypothetical other lessee.

■ This Court therefore holds that a plaintiff bringing a claim under Section 1667b(b) has no standing to litigate the reasonableness of a lease provision that caused him or her no actual injury because it never became applicable to him or her. Accordingly the portion of Count I pertaining to the pre–12–months formula is dismissed.

This opinion moves on to the remaining elements of Count I. By contrast, each of those relates to aspects of the termination formula that apply to early termination at any point in the Lease—before or after 12 months have passed. Those provisions did indeed have the type of impact on Kedzioras that confers a right to dispute them in this litigation.

■ *2. Unearned lease charge.* When the lessee returns a vehicle early and makes the accelerated lease payments, obviously he or she must receive some form of rebate representing the unearned interest or lease charge—that is, a credit for the portion of the accelerated payments that represented interest. Two principal methods are used to compute such rebates: the actuarial method and the Rule of 78's, also known as the Sum-of-the-Digits method. *Gantt v. Commonwealth Loan Co.*, 573 F.2d 520, 524 n. 3 (8th Cir.1978) (citations omitted) has described the two methods this way:

The actuarial method involves a series of computations. As each periodic payment on a loan with a precomputed finance charge is received, the interest due for the period is calculated using the annual percentage rate. The payment is applied first to interest and then to principal. When a subsequent payment is received, the process is repeated, using the new principal as the basis for calculation. When prepayment occurs, the outstanding obligation is limited to the current principal amount. The difference between this amount and the total of remaining payments is the unearned portion of the finance charge.

Under the Rule of 78's method, unearned finance charges, on a loan in which finance charges have been precomputed, are determined in a single computation using a mathematical formula. The lender computes a fraction, the numerator of which is the sum of the series of integers between 1 and the number of payments yet to be made. The denominator is the sum of a series of integers between 1 and the number of payments originally contracted for. This fraction is multiplied by the total precomputed finance charge to determine the unearned portion of that charge.[9]

Kedzioras' lease called for use of the Rule of 78's. Kedzioras maintain that any use of that method guarantees infliction of an unenforceable penalty. Citicorp disagrees.[10]

Once upon a time it seemed well-settled that use of the Rule of 78's did not constitute a penalty under TILA (see, e.g., *Gantt*, 573 F.2d at 525 and *Lanier v. Associates Finance, Inc.*, 114 Ill.2d 1, 16, 101 Ill.Dec. 852, 858, 499 N.E.2d 440, 446 (1986), each citing Regulation Z). But for the most part those and other cases merely

---

**9.** [Footnote by this Court] Either that explanation or any degree of familiarity with mathematic series readily identifies the origin of the name "Rule of 78's" with the sum of the first 12 integers—78. That would be the denominator in a one-year lease or other contract calling for monthly installment payments.

**10.** Kedzioras assert (1) that the "Lease Charge" described in their Lease is not in fact a precomputed finance charge and (2) that the real "interest equivalent" in the Lease payments was higher than disclosed by Citicorp. Citicorp disputes those claims but does not ask for a ruling on them under Rule 12(b)(6), preferring to hold its fire for a summary judgment motion (D.R.Mem. 7).

expressed deference to a Federal Reserve staff commentary that approved the use of the Rule of 78's (Reg. Z § 226.818(b)). Since then that regulation and all accompanying interpretations have been rescinded in favor of Regulation M, as reflected by its Official Staff Commentary (Reg. M § 213 Supp. I–CL–1, Introduction ¶ 3 [11]). Regulation M and its accompanying staff commentary do not even mention the Rule of 78's, much less endorse it.

Some other cases have declined to hold that the Rule of 78's is a penalty primarily because the state legislatures in those jurisdictions have not done so (see, e.g., *Lefler v. Kentucky Finance Corp.*, 736 F.2d 375, 379 (6th Cir.1984) (Kentucky law); *Drennan v. Security Pacific National Bank*, 28 Cal.3d 764, 170 Cal.Rptr. 904, 913, 621 P.2d 1318, 1327 (1981)). That does not describe the Illinois situation, for here the *Lanier* decision approved the use of the Rule of 78's only because the Illinois Supreme Court erroneously thought that Regulation Z and the accompanying Staff Commentary were still good law. Far from issuing a blanket endorsement of the Rule of 78's, the court described the Rule as the source of "an apparent injustice," but one more appropriately corrected by the legislature—which the court actually urged to consider the problem promptly (114 Ill.2d at 18, 101 Ill.Dec. at 859, 499 N.E.2d at 447).

In sum, no case either cited to this Court by Citicorp or reviewed by this Court in its own research holds solely that as a matter of logic and statutory construction—as opposed to deference to the now-rescinded Regulation Z commentary—the Rule of 78's does *not* constitute a penalty under Section 1667b(b). In a very real sense the issue is thus one of first impression, and there is certainly a credible argument to be made for Kedzioras' position. For there is a significant difference between the actuarial method and the Rule of 78's (see, e.g., *Gantt*, 573 F.2d at 524–25 (citations omitted)):

> Under both methods, the amount of interest deemed to be earned by the lender is greatest in the earlier months, it is then that the borrower has use of the greatest portion of principal.

> The Rule of 78's method, however, allocates a greater portion of the finance charge to the creditor in the earlier part of the period than does the actuarial method. In some cases, the results obtained under the Rule of 78's closely approximate those of the actuarial method. In other circumstances, however, the difference can be substantial.

Because the Rule of 78's artificially allocates more of each payment to interest during the early months of the obligation period, less interest remains to be deemed "unearned"—and therefore subject to rebate—during the period following any prepayment. As *Drennan*, 621 P.2d at 1320 (footnote omitted) noted:

> Although the difference between the two methods is insignificant on a short-term loan of a relatively small amount, for larger loans of longer duration, the actuarial method results in a substantially larger refund to the consumer.

See also *Croysdale v. Franklin Savings Ass'n*, 601 F.2d 1340, 1346 (7th Cir.1979) ("in the case of precomputed contracts, the discrepancy in earned finance charge computations under the Rule of 78's and the actuarial method also varies according to the circumstances").

Courts and commentators that address the issue from first principles, rather than from an administrative-law perspective of deference to an expert agency or from a separation-of-powers perspective of deference to a state legislature, tend to side with Kedzioras. In *Drennan*, for example, the California Supreme Court approved the use of the rule based on such deference but said (621 P.2d at 1327):

> Thus, while application of the rule technically or semantically may not be termed a penalty in view of the [Federal Reserve] Board's interpretation, it serves as a substitute for the prepayment penalty prohibited by [California] statute.

---

**11.** Further citations to that Official Staff Commentary will take the form "Reg. M Commentary § 213.— ¶ —," omitting the need to make repeated references to Supp. I–CL–1.

One pair of commentators has also observed that the Rule of 78's generally results in a penalty unrelated to real economic interest (Peter Canellos and Edward Kleinbard, *The Miracle of Compound Interest: Interest Deferral and Discount After 1982*, 38 Tax.L.Rev. 565, 585 (1983) (emphasis in original, footnotes omitted)):

> [W]hen applied to longer-term installment loans at double digit rates, [the Rule of 78's] can result in substantial distortion. Indeed, in some cases the Rule may result in the amount required to prepay the self-liquidating loan in the first few periods of its term *increasing* from period to period. Thus, in practical application, it appears that the Rule of 78's should be viewed as a hidden prepayment penalty, not an accurate measure of the interest cost per period.

See also James Hunt, *The Rule of 78's: Hidden Penalty for Prepayment in Consumer Credit Transactions*, 55 B.U.L.Rev. 331 (1975), demonstrating the magnitude of the distortion in particular cases.

One argument often advanced on the other side of the debate is that the Rule of 78's is easier for lenders to apply. They can calculate interest rebates with one equation, while the actuarial method requires individualized successive calculations (*Gantt*, 573 F.2d at 525). But the advent of pre-programmed electronic calculators (to say nothing of computers) permits a direct and instantaneous readout of the relevant figures under the actuarial method, reducing the ease-of-application consideration to de minimis proportions (see Canellos and Kleinbard, 38 Tax.L.Rev. at 566, referring to the Rule of 78's as having been "adopted to facilitate calculation in the pre-electronic world"). With the weight of independent thinking on the subject appearing to tip substantially toward Kedzioras' side of the argument, it is tempting to give no deference at all to the once-binding Regulation Z commentary, which begins to look more and more like the result of lender lobbying rather than thoughtful analysis.

To focus once again on the essential inquiry: Does the use of the Rule of 78's constitute a reasonable ex ante means of assuring Citicorp its expected return on the lease? To provide an affirmative answer, Citicorp must show [12] from the ground up, so to speak, that use of the Rule is reasonable in economic terms. Perhaps (to offer but two possibilities along that line) Citicorp can show that the Rule as ordinarily applied in car leases simply measures real economic interest, or that early termination inflicts particular costs upon the lender that are captured within a reasonable margin of error by use of the Rule (recall that under Section 1667b(b) liquidated damages must address injuries "caused by" early termination). For if the Rule of 78's always or virtually always credits the lender with interest that is *not* yet earned in the economic sense, use of the Rule may well be proscribed by the *Lake River* treatment.[13]

For purposes of the current motion it is necessary only to say that this aspect of Kedzioras' Complaint survives. Citicorp has not demonstrated that Kedzioras, by alleging that use of the Rule of 78's is unreasonable, have failed to state a claim upon which relief may conceivably be granted. Yet it is important to note the significance of the issue to this case in particular and to the lending industry in general. In light of those factors, and given the relatively minimal attention paid

---

**12.** This use of "show" rather than "prove" is deliberate: It refers to Citicorp's intellectual burden as the moving party, not an ultimate burden in the legal sense. It is of course Kedzioras—as plaintiffs, and as the parties resisting enforcement of the contract term—who ultimately bear the burden of proof in this action.

**13.** Even though *Lake River* was decided under Illinois law and therefore quoted from and cited to Illinois cases for the most part, its discussion appears to this Court to address the problem in more universal terms. Judge Posner's contemplation of a universe in which the notion of an unenforceable penalty might be eliminated entirely from a free market approach to the law of contracts was admittedly speculative, rather than a reflection of current jurisprudence. And it must be recognized that (for better or worse) the Act is the product of just the opposite philosophy—a protectionist approach to consumers who deal with what Congress appears to view as contracts of adhesion.

to the issue in the briefs filed by the litigants to this point, this Court is equally unprepared to hold that Kedzioras' view prevails as a matter of law. Instead, it invites further discussion of this issue in the summary judgment proceedings that Citicorp has already promised will follow the issuance of this opinion.[14]

■ *3. Disposition charge.* Under Lease ¶ 27(a) Citicorp imposed a $300 "disposition charge" at termination. Kedzioras maintain that such a charge is arbitrary and therefore unreasonable. They emphasize that it constitutes "double counting," because Citicorp allegedly deducts the cost of disposition from the net resale proceeds before crediting the lessee with those proceeds in determining early termination liability.

That argument is easily rejected. Official staff commentary to Regulation M (Reg. M Commentary § 213.2(a)(14) ¶ 4) indicates that disposition charges are to be permitted, even while it forbids lessors from deducting the charges when computing realized value of the returned vehicle. So Citicorp may collect a disposition charge, as it does, but it may not double-count the charge to Kedzioras' detriment. More importantly, there is no reason to believe that it does such double-counting— except that is for Kedzioras' present assertion, which is not even found in the Complaint and therefore cannot be credited for current purposes. Finally, an identical disposition charge is imposed on lessees who satisfy their full lease obligations. So the charge is not really an early termination charge as such, and it therefore is not properly considered under Section 1667b(b).

■ *4. Wholesale v. retail value.* Under Lease ¶ 17 Kedzioras authorized Citicorp to sell the car "at wholesale or retail as you determine" and then reduce Kedzioras' liability by the amount of the sale proceeds. Kedzioras agreed to be liable for any amount by which the car's estimated end-of-term value exceeded the sale proceeds. That aspect of the Lease serves to mitigate the lessor's damages, and the question for decision here is whether that method of mitigation withstands Kedzioras' attempts to depict it as "unreasonable."

Kedzioras argue that Citicorp should not be free to choose between wholesale and retail disposition of the car, when retail prices are obviously always higher. But Regulation M squarely rejects that argument (Reg. M Commentary § 213.4(d) ¶ 4):

> The lessor may choose either a retail or wholesale value in estimating the value of the leased property at termination, provided that choice is consistent with the lessor's general practice or intention when determining the value of the property at the end of the lease term.

Express regulatory approval of a particular method of disposition obviates any inquiry into the method's reasonableness. In the face of the language just quoted, no court could hold that Section 1667b(b) requires retail disposition.

Kedzioras also object to the absence of any requirement of notice or public sale. They evidently mean to conjure up the specter of a lessor unloading cars through a fire sale designed to minimize its own transactions costs. After all, with a solvent lessee the lessor will receive the same amount of damages regardless of the vehicle's resale price.[15] But the statute does

---

14. As chance would have it, this Court's calendar also includes (by purely random assignment) another putative class action brought under the Act, this one challenging the form lease of General Motors Acceptance Corporation ("GMAC"): *Wesley v. GMAC,* No. 91 C 3368, 1991 WL 169204. *Wesley* has just now reached the completion of the briefing stage as to class certification under Rule 23, but if the action survives in substantive terms it will doubtless generate still another set of briefs on the Rule of 78's question (though Kedzioras' counsel also represents the *Wesley* plaintiff, GMAC is represented by lawyers other than those who act for Citicorp here).

15. Although this consideration cannot of course control the statutory concept of reasonableness, this opinion's insertion of the "solvent lessee" reference is obviously a deliberate one. It is intended to highlight the practical factor that it is really in the lessor's own best interest to maximize the proceeds derived from the resale of a leased vehicle that has come back into its possession before the normal expiration of the lease term. Normally that betokens a lessee in some financial difficulty, and whether or not

provide lessees with a measure of legal protection, not just the practical one described in n. 15: They may obtain an independent appraisal under Section 1667b(c), and the lessor must be bound by that appraisal in determining the car's residual value. So the lessor cannot simply dump the car. Without doubt a lease that chose to include a requirement of notice or public auction would be "reasonable," but that does not at all equate to rendering unreasonable the omission of such a requirement.

Kedzioras also argue that no sale is necessary to determine residual value. Instead the lessor could simply pick a number off a graph that charts expected depreciation on one axis and months gone by in the lease on the other axis. In such an approach the lessor would credit the lessee with the car's expected value rather than its actual value, eliminating the possibility that the lessee would have to pay for any shortfall between expected and actual value. But as D.R.Mem. 9 points out, under Kedzioras' suggested method lessees would simply exchange one risk for another: True enough, they would never pay for a shortfall upon sale—but if the actual resale value exceeded the originally prophesied value they would never be credited with that higher figure.

Finally, Kedzioras point out that if the lessee returns the car after the full Lease term, Citicorp then bears the risk of any shortfall between actual and estimated values. Only upon early termination does that risk shift to the lessee. Assume that

estimated residual value is stated in the lease as $5,000, but that the car when returned to the lessor brings only $1,000 in the resale market. In that scenario the lessor receives $4,000 less than initially estimated, because residual value of the car is an important component of expected return on the lease. If that happens at the end of the Lease term the lessor absorbs the loss, but if it happens upon early termination the lessor charges the lessee with the $4,000 shortfall.

In other words, in terms of the original estimate of value projected by Citicorp for the end of the lease term, Citicorp agrees to suffer the consequences of any inaccuracy in that prediction if the lessee fulfills his or her entire 60-month obligation, but it demands that the lessee who terminates early must bear the risk of inaccuracy of the original estimate. Again to restate the essential inquiry: Is that aspect of the damage formula reasonably calculated to ensure Citicorp its expectancy damages, or is it merely a profit-enhancer calculated to punish the lessee who terminates early?

As a predicate for answering that inquiry it should be assumed that the initial estimate of residual value is itself reasonable. Kedzioras have not disputed the reasonableness of the estimate, which Citicorp presumably derived through some industry-standard methodology, so this Court does not question its reasonableness either. That figure therefore must be treated as part of Citicorp's expected return on the Lease.[16]

that is so the lessor is always better off if most if not all of its recovery can be obtained from a single source—the resale of the vehicle—without having to pursue the lessee as well. To that extent (and it is hardly an insignificant one) the interests of the lessor and lessee converge rather than diverge, and the specter sought to be invoked by Kedzioras is less realistic.

**16.** Once more a bit of thought demonstrates the reasonableness of that assumption. When Citicorp (or any lender) puts together its loan package, it consists of two components (each necessarily factored in terms of projections as to interest rates to make the transaction attractive for the lender as a business matter): the lease payments and the residual value. Where the normal expectancy is realized—Citicorp collects

the monthly installments from the lessee for the full term, followed by a sale of the returned vehicle—Citicorp's original projection of the value as of that date has no utility other than its having served as part of the *initial* economic analysis of the transaction (it will be remembered that Citicorp cannot look to the lessee in that situation). It takes a Machiavellian mindset to assume that Citicorp effectively keeps two sets of books so far as the estimated residual value is concerned—one for its own internal use in projecting the economics of the deal, the other (higher) externally-stated value being inserted in the lease to catch the lessee who defaults and must therefore run the risk of a disparity as against the actually realized resale value. Not only does that risk diminish in likelihood because of the lessee's right of self-pro-

Next it is in order to consider what risk Citicorp bears at the end of the five-year lease:

1. If market conditions change (suppose Citicorp leases out a gas guzzler during an oil glut and gets it back five years later during an oil shortage, or suppose any one of a myriad of much less dramatic economic changes) so that the car turns out to be worth less than the originally expected amount, then Citicorp must absorb the loss. It cannot turn to the lessee to make up the difference.

2. If such variables as driver negligence or excessive wear and tear reduce the market value below expectations, again Citicorp must bear the loss. That loss may of course be hedged by the various lease provisions obligating the lessee to pay repair costs or excess mileage fees, but Citicorp has no assurance of recapturing the entire difference.

3. If the car turns out to be worth *more* than the initial projection, then Citicorp keeps 100% of the excess.

As against that, here is the analysis of how the risk-shifting might play out if the lessee terminates early for any reason:

1. If outside forces such as changed market conditions reduce actual value below the originally estimated value, then the lessee must pay Citicorp the difference. But the lessee can shift the risk back to Citicorp merely by exercising his or her right to a binding third-party appraisal under Section 1667b(c). Presumably an appraiser will bring the initially estimated residual value in line with what has proved ex post to represent reality.

2. If the decline in market value is caused by excessive wear and tear, inadequate maintenance or (in the case of a demolished car) a shortfall in collision insurance, then the risk shifts:

(a) In the case of negligence or wear and tear, the lessee presumably could still use the appraisal mechanism of Section 1667b(c) to shift the risk back to Citicorp—though Citicorp, of course, may still have the possibility of recapturing part (or perhaps even all) of its loss through mileage penalties or repair fees.

(b) In the demolition case Section 1667b(c) would not be available—there is nothing left to appraise—but in that event the lessee is properly liable for Citicorp's loss. Citicorp's formula takes a rather precise accounting of "actual harm caused by the ... early termination," as authorized by Section 1667b(b).

3. If actual value exceeds the originally estimated end-of-term value (an eventuality made more likely just by reason of the time differential—see n. 16), then Citicorp must credit the lessee with the difference. In that case early termination works to the lessee's advantage.

From that comparison it is evident that the Lease's shifting of risk is eminently reasonable. It is difficult if not impossible to conceive of a situation in which the shifting of risk will increase the lessor's return on the Lease *above* its initial expectations as spelled out in the predicted resale value (in which event the lessor would receive more than the benefit of the full-term bargain that the parties struck at the outset). In a certain limited range of cases the shifting of risk may serve to increase the lessee's obligations, but that is not at all the same thing as imposing a penalty— and it is a reasonable means of compensating Citicorp for the defeat of its basic expectation that the lessee will fulfill the entire Lease.[17]

tection by the appraisal route, but the natural depreciation in value of every automobile over time gives the lessee an added cushion, because a sale during the lease term is that much more likely to produce a higher figure than an end-of-term projection.

17. Such an increase in the lessee's cost may appear arbitrary in certain circumstances, especially if it occurs very close to the end of the lease. For example, although Kedzioras terminated after nearly 24 months, the same early termination formula would apply to a lessee who terminates after 59 months. Yet that example only reconfirms a familiar proposition: Deadlines and time limitations, though essential to so many forms of legal obligation, may create

Accordingly that challenged aspect of the Lease is reasonable within the meaning of Section 1667b(b). Count I is dismissed to the extent that it poses that challenge.

■ *5. Excess mileage charge.* Lease ¶ 20 imposes a charge of 10 cents for every mile driven above 75,000 miles over the five-year term. Such charges for excess wear and use must be "reasonable" (Reg. M § 213.4(g)(8)), while Kedzioras characterize the excess mileage charge as unreasonable. Citicorp rejects that characterization but agrees that the issue is not suitable for resolution under Rule 12(b)(6) (D.R.Mem. 11). That aspect of the Complaint therefore survives the current motion.

### Count II: Inadequate Disclosure— Class Claim

Count II raises Kedzioras' second federal claim, charging inadequate disclosure of various Lease terms. This opinion will not deal at any length with each purported disclosure violation, for this Court finds that none of Kedzioras' allegations state a claim. To begin, it may be helpful to recall the general rule (Reg. M § 213.4(a)): All disclosures must be made "clearly, conspicuously, in meaningful sequence, and in accordance with the [specific] requirements" of Regulation M, which further mandates disclosure of "[t]he amount or method of determining the amount of determining any penalty or other charge for delinquency, default, or late payments" (*id.* § 213.-4(g)(10)).

■ *1. Disclosures as to early termination liability.* Kedzioras complain that the disclosures of early termination liability are generally hard for the average consumer to understand, and that Citicorp has made life particularly difficult for the consumer by cross-referencing among incomprehensible provisions. Yet generally speaking the Lease (though of course a form document) is straightforward. It is two pages long and largely free of jargon. Each paragraph identifies its subject matter in clear terms and capital letters. Essential financial obligations are clearly

spelled out. Formulas are necessarily used where the only way to provide hard numbers that accounted for every contingency would be to include an enormous chart of possible costs to the lessee.

There is no avoiding the fact that a lease must contain a lot of information, much of it technical, legal or mathematical. Not all such information can be conveyed in terse everyday language. Perhaps the Lease at issue here could be made clearer if it were made longer—if every cross-reference were replaced by repetition of the matter covered, and if every significant term and contingency were spelled out in detail. But the Act certainly does not require the lessor to take such steps, and no doubt if the lessor did some plaintiffs' lawyer would argue (with justification) that the lessor had burdened the consumer with "informational overload" in violation of the Supreme Court's warning in *Ford Motor Credit.*

Kedzioras object to several particular aspects of Citicorp's disclosures. None of the claims calls for a great deal of discussion.

Calculation of early termination liability under Lease ¶¶ 16 or 17 involves a reference to various other Lease provisions. But such cross-referencing is expressly permitted under the staff commentary to the relevant regulation (Reg. M Commentary § 213.4(a) ¶ 3), and the Supreme Court has held that such staff commentaries are entitled to substantial deference (*Ford Motor Credit,* 444 U.S. at 567–68, 100 S.Ct. at 797–98). Kedzioras have offered no glimmer of an argument sufficient to overcome such required deference. It might well be desirable from the consumer's point of view for the lessor to condense certain information more than Citicorp has done, but this Court sees no reason to dispute or disregard the staff commentary.

■ Lease ¶ 17 states that Citicorp will calculate the rebate of unearned finance charges "by the sum of the digits method." Kedzioras claim that any such reference to the Rule of 78's by name alone (or in this case by its a/k/a) provides inadequate dis-

distasteful results when enforced (as they must

be) close to or at the margin.

closure. Kedzioras argue that Citicorp must disclose the substantive operation of the rule.

Until Regulation Z was rescinded any such claim would plainly have been a non-starter, for the official staff commentary flatly stated that reference to the rule by name alone was adequate (Reg. Z Commentary § 226.818(c), in the course of interpreting the requirement in Reg. Z § 226.8(b)(7) for "identification" of rebate method). Many cases (see, e.g., *Nesbitt v. Blazer Financial Services, Inc.*, 550 F.Supp. 819, 825 & n. 4 (N.D.Ill.1982)) relied on that commentary in rejecting disclosure-based challenges to use of the Rule of 78's.

In light of Regulation Z's rescission those cases no longer control, and the issue (like the already-discussed penalty issue) is open for fresh analysis. In this instance, however, this Court finds the *logic* of the former commentary still compelling, even though it no longer has an official anchorage (Reg. Z Commentary § 226.818(c) (emphasis added)):

> Many State statutes provide for rebates of unearned finance charges under methods known as the "Rule of 78's" or "sum of the digits" or other methods. *In view of the fact that such statutory provisions involve complex mathematical descriptions which generally cannot be condensed into simple accurate statements, and which if repeated at length on disclosure forms could detract from other important disclosures,* the requirement of rebate "identification" is satisfied simply by reference by name to the "Rule of 78's" or other method, as applicable.

Earlier this opinion quoted the portion of *Gantt* in which the Eighth Circuit attempted a brief and straightforward comparison of the actuarial and Rule of 78's methods. That attempt confirmed what the just-quoted commentary suggests and Kedzioras surely must know: Disclosure of the method of calculations under the Rule of 78's really tells the average consumer nothing. Perhaps a lengthy exposition of the rule would tell the consumer something, but not without making the Lease far longer by weighing it down with technical language and mathematical terms more likely to confuse than to enlighten. Disclosure is not "clear and conspicuous" if it has that effect.

Our own Court of Appeals has emphasized in *Smith*, 615 F.2d at 414 that Truth in Lending disclosures should serve:

> to remedy abuses resulting from consumer ignorance of the nature of credit arrangements by requiring disclosures in the hope of enabling consumers to shop for credit by comparing uniform terms.

Measured against that standard Kedzioras' allegation must fail. If the average consumer were to read a description of the operation of the Rule of 78's and a description of the actuarial method, he or she would hardly be in a better position to shop for credit. What might pass for technical full disclosure would in practice substitute obfuscation for the summary that is afforded to Citicorp's lessees.

What Kedzioras really want, no doubt, is for the lease to say something along these lines:

> There are two methods of calculating unearned finance charges. Method # 1 tends to favor us, the lessors. Method # 2 tends to favor you, the consumers. We use Method # 1.

But Regulation M permits disclosure of "methods or amounts" and does not require disclosure of *effects*. Kedzioras' disclosure claim as to the Rule of 78's (and for that matter their disclosure claims in general) really just restates their penalty claim. Either the Rule of 78's is a penalty or it is not. If it is not and is therefore enforceable, its very nature is such that the kind of expanded exposition asked for by Kedzioras as to its "substantive operation" will not help the consumer make useful comparisons among competing lease options.

It is not necessary to delve into any of the subsidiary disputes between Kedzioras and Citicorp, such as whether there are relevant differences between loans and leases (P.Mem. 26) or whether the "lease charge" denoted by Lease ¶ 28(a) is really the equivalent of a precomputed finance

charge. At issue here is whether the particular disclosure demanded by Kedzioras would tell the consumer anything of value, and this Court concludes as a matter of law that the answer is "no." That aspect of the Complaint is dismissed.

Next Complaint ¶ 31(b) asserts that all disclosures relating to warranties and default must be on the front of the form and above the consumer's signature, while some of the pertinent disclosures in the Citicorp lease appear on the back and below the consumer's signature. Kedzioras misread Regulation M, which in fact permits disclosures to appear on both sides of the lease form. At any rate, this Court's review of the Lease confirms that no disclosures required by the Act in fact appear below Kedzioras' signatures.

■ *2. Disclosure of express warranties.* Complaint ¶ 31(c) alleges that Citicorp has failed to make adequate disclosure of "any express warranties and guarantees," as required by Reg. M § 213.4(g)(7). Lease ¶ 6 states that "the manufacturer's standard warranty" is the only warranty "that accompanies the leased vehicle and for which only the manufacturer is responsible." Kedzioras suggest that Citicorp's characterization violates TILA because the manufacturer (in this case the Pontiac division of General Motors) actually provides multiple warranties.

It is an understatement to label that claim as frivolous. It depends on a distinction between the singular and the plural that no sensible consumer would be likely to make—not even a grammarian consumer (for it is perfectly good usage to speak of a "standard warranty"—a document—as embracing multiple "warranties"—assurances). Lease ¶ 6 adequately communicates that the lessee is getting all the protections that the manufacturer ordinarily accords to vehicle buyers, and no additional protections from the lessor. That aspect of the Lease assuredly complies with the Act and Regulation M.

\*　　\*　　\*

In summary, all the matters asserted in Complaint Count II fail to withstand scrutiny. That Count is dismissed in its entirety.

### Count III: Inadequate Disclosure— Individual Claim

■ Count III alleges that Citicorp failed to disclose Kedzioras' end-of-lease purchase option price, as required by Reg. M § 213.4(g)(11). Kedzioras separate that claim from the now-dispatched disclosure violations alleged in Count II because they say that they do not yet know whether such inadequate disclosure is widespread enough to justify a class action allegation (Complaint ¶ 33).

Lease ¶ 19 specifies that Kedzioras had the option to purchase their Grand Prix at the end of the Lease for the "fair market value at wholesale as determined by [Citicorp]." Then the paragraph goes on to specify the industry statistics and publications that Citicorp will use to determine fair market value at the end of the Lease, and it says that the estimated end-of-term wholesale value specified in Lease ¶ 28(b) constitutes the ex ante estimate of purchase price.

Reg. M § 213.4(g)(11) requires:

A statement of whether or not the lessee has the option to purchase the leased property and, if at the end of the lease term, at what price, and, if prior to the end of the lease term, at what time, and the price or method of determining the price.

If read in isolation, that language might be viewed as requiring disclosure of the purchase price in the form of a sum certain for any end-of-lease purchase, even while permitting disclosure in the form of an estimate for any purchase during the lease term.[18]

But the quoted language must be read in light of the provision of Regulation M that precedes it (Reg. M § 213.4(d)), which specifically permits the use of estimates where information is not known at the time the lease is executed. Indeed, that instruction explicitly contemplates that end-of-term

---

**18.** In this instance Kedzioras' Lease did not permit purchase during the lease term.

value estimates may be used as a surrogate for purchase price:

> provided the estimate or approximation is clearly identified as such, is reasonable, is based on the best information available to the lessor, and is not used for the purpose of circumventing or evading the disclosure requirements of this regulation.

On its face Citicorp's estimate satisfies those requirements.

Quite apart from the business of construing Regulation M, it is useful to compare that Regulation with the statute itself. Under Section 1667b(c) the consumer may obtain an independent assessment of residual value at the end of the lease, and that assessment becomes binding on both the consumer and the lessor. That provision reflects Congress' desire that end-of-term purchase prices should conform to real market values at the end of a lease term, so that manufacturers cannot profit by making overly high ex ante estimates and then fixing them in the form of a sum-certain purchase price. Nothing in that goal, or in the statute itself, suggests that Congress intended that consumers ought to gain the windfall that would result if the provision were taken to mean that the lessor must specify a sum certain, with any deviation between the sum certain and market value redounding only to the consumer's benefit. Hence Citicorp's Lease provision serves the same basic purpose as Section 1667b(c).

Kedzioras offer no credible argument as to why the challenged aspect of the Lease disclosures is not "clear and conspicuous" within the meaning of the statute. Complaint Count III is also dismissed.

### Count IV: Common–Law Penalties

■ Count IV simply restates all the allegations of Count I. Kedzioras assert that the same provisions that supposedly constitute unenforceable penalties under the Act also constitute unenforceable penalties at common law. This opinion has already said in its discussion of Count I

that Congress evidently enshrined in the Act the same common-law standards as found in the UCC and the Restatement (Second) of Contracts. Subject only to any uncommon-law variations that might be found in Illinois, then, Counts I and IV ought to drink from the same trough. Citicorp seems to agree with that proposition (D.R.Mem. 22), whether "common law" is taken to mean the UCC, the Restatement or the new Article 2A of the UCC recently passed by the Illinois General Assembly.[19]

One difference in terminology should be noted: While the common law generally distinguishes between enforceable liquidated damages provisions on the one hand and unenforceable "penalties" on the other, the Act in contrast specifies that "penalties or other charges" are enforceable as long as they are "reasonable" (Section 1667b(b)). That statutory provision should not be read to create any substantive difference in interpretation. Under both the federal and common-law regimes the essential test is whether a particular charge is "reasonable," not whether it is labeled a penalty or something else.

All aspects of the Complaint that this Court has found to survive the motion to dismiss under Count I are also held to survive the motion to dismiss under Count IV. All aspects of the Complaint that this Court has dismissed under Count I are also dismissed under Count IV.

### Count V: Unfair and Deceptive Acts and Practices

■ Kedzioras' Count V more or less rehashes their entire list of grievances, then argues that those grievances state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act. That statute, commonly known as the Consumer Fraud Act ("CFA"), reads in relevant part (Ill.Rev.Stat. ch. 121½, ¶ 262):

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pre-

---

**19.** On one subject, at least, Count IV permits less room for possible doubt than Count I.

*Lake River* surely marks out the penalty v. liquidated damages line under *Illinois* law (cf. n. 13).

tense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act [the "FTC Act," 15 U.S.C.A. § 45].

Kedzioras allege that Citicorp's Lease is both unfair *and* deceptive within the meaning of CFA. Citicorp counters that the Lease is neither unfair *nor* deceptive.

Citicorp also contends that practices that are merely "unfair" are not actionable under CFA, and this opinion's discussion of Count V must begin with that contention. It is well settled that under the FTC Act a practice may be actionable if it is merely "unfair": if it "offends public policy" as defined by statute or common law, if it is "immoral, unethical, oppressive, or unscrupulous" or if it "causes substantial injury to consumers (or competitors or other businessmen)" (*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972)). There is no requirement of deception or of intent to defraud, although practices meeting this standard are also actionable.

Illinois courts once followed the same interpretation in construing CFA (see, e.g., *People ex rel. Fahner v. Hedrich*, 108 Ill. App.3d 83, 89–90, 63 Ill.Dec. 782, 786–87, 438 N.E.2d 924, 928–29 (1st Dist.1982)). But just last year the Illinois Supreme Court has narrowed its construction of CFA to exclude practices that are merely "unfair" from the scope of the statute. Now a CFA plaintiff must allege materially more than that, because that court now says of the CFA "that its reach was to be limited to conduct that defrauds or deceives consumers or others" (*Laughlin v. Evans-*

*ton Hospital*, 133 Ill.2d 374, 390, 140 Ill. Dec. 861, 868, 550 N.E.2d 986, 993 (1990)). Conduct that is *both* unfair and deceptive remains actionable, so that the *Sperry & Hutchinson* factors appear to retain some force in Illinois, but only insofar as they serve to make deceptive conduct seem even worse.

Kedzioras ask this Court to read *Laughlin* quite narrowly. They argue that *Laughlin*, which dealt with what was essentially an antitrust claim, merely excluded price discrimination from the scope of CFA. In support of that view they note two Illinois Appellate Court decisions that postdate *Laughlin* and appear to hold that unfair practices that are not deceptive remain actionable under CFA (*People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill. App.3d 843, 159 Ill.Dec. 318, 325–27, 575 N.E.2d 1378, 1385–87 (2d Dist.1991); *Elder v. Coronet Ins. Co.*, 201 Ill.App.3d 733, 743, 146 Ill.Dec. 978, 982, 558 N.E.2d 1312, 1316 (1st Dist.1990)).

It is certainly true that CFA plainly encompasses "[u]nfair methods" and "unfair or deceptive acts or practices" (emphasis added). In *Laughlin* the court leapt past not only that language but also a long history of interpretation consistent with federal law to hold that the legislature intended only to target "fraud" (133 Ill.2d at 390, 140 Ill.Dec. at 868, 550 N.E.2d at 993). Nonetheless *Knecht* and *Elder* have since endorsed the notion that a CFA plaintiff may state a claim for "unfair" conduct.

It is hard to know which is more puzzling: *Laughlin*'s reading of the statute or *Knecht*'s and *Elder*'s disregard of *Laughlin*. Those two Appellate District cases do not distinguish *Laughlin*. Instead they plainly ignore it, looking instead to the *Sperry & Hutchinson* analysis under the federal statute. That being so, they cannot control this Court's decision on a point of Illinois law.

*Laughlin*'s holding is plainly not limited to the antitrust context—as still another Appellate District has said (*Sullivan's Wholesale Drug Co. v. Faryl's Pharmacy, Inc.*, 214 Ill.App.3d 1073, 158 Ill.Dec. 185,

191, 573 N.E.2d 1370, 1376 (5th Dist.1991)), its language is far too broad to support such an interpretation. *Sullivan, id.* 158 Ill.Dec. at 191 & n. 1, 573 N.E.2d at 1376 & n. 1 (citation omitted), takes the identical view of *Laughlin* that this Court has reached:

> While the construction placed on the FTCA by the Federal courts should be considered in construing the Consumer Fraud Act, the two statutes are not coextensive. Just because conduct may run afoul of the FTCA or section 2(c) of the Clayton Act does not mean that it automatically violates the Consumer Fraud Act. To the contrary, our supreme court has now held quite explicitly that, unlike the Federal law, the reach of the Consumer Fraud Act "is limited to conduct that defrauds or deceives consumers or others." Thus, Sullivan's cause of action must stand or fall on whether defendants' conduct was deceptive. If it was not deceptive, whether it violated other laws or ethical standards is irrelevant.[1]

> [1][C]onduct which is merely unethical is not actionable under the Consumer Fraud Act....

For that reason Illinois Supreme Court Justice William Clark felt compelled to file a concurring opinion in *Laughlin* strongly disagreeing with the proposition that CFA does not encompass "unfair" practices (133 Ill.2d at 394, 140 Ill.Dec. at 869–70, 550 N.E.2d at 994–95).

So Kedzioras cannot state a claim under CFA for "unfair" practices unless the practices are also "deceptive." Pre–*Laughlin* it was possible under Illinois law to scrutinize business forms and pronounce them nondeceptive as a matter of law, but only after applying a very broad notion of deception, one not requiring proof of fraud (*Harwood v. Piser Memorial Chapels*, 102 Ill.App.3d 514, 518, 58 Ill.Dec. 521, 523, 430 N.E.2d 553, 555 (1st Dist.1981)):

> What is required is a showing that the acts and practices were capable of being interpreted in a misleading way.

Although *Laughlin* might also arguably have been read as narrowing the definition of deception to require proof of *scienter*— intent to defraud—the Illinois Supreme

Court has even more recently restated the broader view: It is enough that a business form be "misleading," and whether it is in fact "misleading" is a factual question not susceptible to decision as a matter of law (*People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill.2d 1, 15, 165 Ill.Dec. 655, 670, 585 N.E.2d 51, 66 (1991)). Even though *Datacom Systems* does not discuss *Laughlin*, it is more recent and therefore this Court will treat it as controlling in that respect.

What this all boils down to is that Kedzioras must make only a minimal showing that the form Lease was susceptible to misleading interpretation. Their own argument seems to presuppose that the Lease is "deceptive" as a matter of Illinois law only to the extent that it violates federal law (P.Mem. 37). Thus Count V survives only insofar as Kedzioras' federal counts survive.

It follows that Kedzioras may pursue their claim under CFA only as they pertain to the few remaining aspects of Count I. And before granting relief on any of those aspects, this Court would certainly require further elucidation by the parties of the relevant Illinois standards for determining what is and is not "misleading."

## CONCLUSION

In summary, then, portions of Count I survive the motion to dismiss. Counts II and III are dismissed in their entirety. Count IV survives to the extent that the corresponding portions of Count I survive. That is true of Count V as well. Kedzioras and Citicorp are directed to appear before this Court at 10 a.m. on November 25, 1991 for a status hearing on the future course of this case.