Merrilou **KEDZIORA**, Plaintiff,

v.

**CITICORP NATIONAL SERVICES, INC., Defendant.**

No. 91 C 3428.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 25, 1995.

See also, 883 F.Supp. 1155.

Alan Norris Salpeter, Terri A. Mazur, Jeffrey S. Kinsler, Victoria R. Collado, Lynne M. Raimondo, Mayer, Brown & Platt, Chicago, IL, for defendants and counter-claimant.

James O. Latturner, Edelman & Combs, Chicago, IL, for amici curiae.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In this final round of cross-motions for summary judgment, the plaintiff Merrilou Kedziora ("Kedziora"), on behalf of a class of persons similarly situated ("plaintiffs"), claims that the early termination provision of a consumer automobile lease assigned to the defendant, Citicorp National Services, Inc. ("Citicorp"), violated the disclosure requirements of the Consumer Leasing Act, 15 U.S.C. § 1667a(11) (the "CLA") and its implementing regulations 12 C.F.R. Part 213 ("Regulation M"). According to Kedziora, Citicorp's lease violated the CLA because it *disclosed* one rebate method (the Rule of 78s) but *applied* another. This alleged disclosure violation is the only claim presented in the Fourth Amended Complaint. For the reasons given below, the Court finds that Kedziora is entitled to judgment as a matter of law.

### I. Summary Judgment Standards

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Materiality[1] is determined by assessing whether the fact in dispute, if proven, would satisfy a legal element under the theory alleged or otherwise affect the outcome of the case. *Id.* at 247, 106 S.Ct. at 2509. The Court must view all the evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.,*

Daniel A. Edelman, Cathleen M. Combs, Edelman & Combs, Chicago, IL, Francine Schwartz, Law Offices of Francine Schwartz, Arlington Heights, IL, Lawrence Walner, Carol Jill Coplan, Lawrence Walner & Associates, Ltd., Chicago, IL, Lisa I. Vessey, Law Offices of Lisa I. Vessey, Chicago, IL, for plaintiffs and counter-defendants.

---

1. "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509. Factual disputes that are irrelevant or unnecessary are not material. *Id.*

822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the non-movant's favor. *Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). If the evidence, however, is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56; *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1032 (7th Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## II. Undisputed Facts

On September 1, 1988, plaintiff Merrilou Channell ("Kedziora") and Thomas Kedziora executed a consumer automobile lease for a 1989 Pontiac Grand Prix automobile (the "lease"). 12(M) ¶ 4. The lease was later assigned to Citicorp. 12(M) ¶ 5. Citicorp, however, is an original lessor for purposes of the Consumer Leasing Act and Regulation M. *Id.* On August 19, 1990, the automobile that was the subject of the Lease was totally destroyed in an accident. 12(M) ¶ 6. Under the terms of the lease, the destruction of the vehicle constituted a default and early termination. 12(M) ¶ 7. The lease disclosed that the "Sum of the Digits" or the Rule of 78s method would be used to determine the unearned amount of the early termination charge in the event of a default. 12(M) ¶ 8. The rebate of the unearned portion of the Kedzioras' lease charge was calculated by the actuarial method, not by the Rule of 78s. 12(M) ¶ 9. In September of 1988, when Kedziora entered into the lease, Citicorp calculated all early termination lease charge rebates using the Rule of 78s method to all cases of early termination under the lease. 12(M)

¶ 10. After December 31, 1989, Citicorp began calculating the rebate for insurance total loss lessees using the actuarial or the Rule of 78s, whichever resulted in a greater benefit to the lessee. 12(M) ¶ 12. In 1990, Citicorp revised its leases to provide that, in the event of an insured total loss, Citicorp would accept the insurance proceeds in satisfaction of any early termination liability. 12(M) ¶ 13. The Citicorp New York lease with the revised total loss provision went into effect on January 1, 1990. *Id.* The lease with the revised total loss provision for the several remaining states went into effect on July 1, 1990. *Id.* On the 1990 revised total loss leases, Citicorp calculates all early termination charge unearned lease charge rebates to consumers using the Rule of 78s. 12(M) ¶ 14. Of the approximately 376 class members, only 41 executed the same lease form as Kedziora after the December 31, 1989 change to use of the actuarial method. 12(M) ¶ 16. Citicorp ceased purchasing automobile leases on February 28, 1991. 12(M) ¶ 15. Citicorp's net worth as of June 1995 was $37,699.073. 12(M) ¶ 17.

## III. Analysis

 The application of an undisclosed method for calculating early termination charges in cases of default is a "technical" disclosure violation under the CLA, 15 U.S.C. § 1667a(11) and Regulation M. Although Citicorp makes two clever arguments in support of its position that the undisclosed actuarial method does not constitute a violation, these arguments are meritless in the face of *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434 (7th Cir.1994), which—despite Citicorp's efforts to distinguish its facts from those in this case—squarely held that "failing to disclose *any portion* of the formula that a lessor actually uses for calculating the early termination charge, will give rise to a technical violation of the disclosure provision found in 15 U.S.C. § 1667a(11) and Regulation M." *Id.* at 439 (emphasis added). A violation occurs, held the Circuit Court, even when "the lease states a formula that produces an early termination charge that is in fact much larger than the actual charge that will be imposed." *Id.* Concomitantly, a violation occurs when the undisclosed formula applied

to the lessee results in a lower charge than the one disclosed in the lease.

### A. The Definition of A "Charge"

This ruling definitively resolves the first question raised by Citicorp, namely, whether the application of an undisclosed actuarial method that results in a lower overall termination charge (due to a present value discounting) is, in fact, a "charge" which must be disclosed under the CLA. Although the actuarial method applied to Kedziora's lease resulted in a lower charge, and thus a better deal, the fact of nondisclosure still constitutes a technical violation of the disclosure provisions in section 1667a(11) of the CLA, despite the holdings in several related Truth In Lending Act ("TILA") cases (cited by Citicorp) in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Stewart v. Ford Motor Credit Co.*, 685 F.2d 391 (11th Cir.1982); and *Ford Motor Credit Co. v. Mells*, 249 Ga. 106, 290 S.E.2d 271 (1982).

 The Truth In Lending Act's damage provisions (section 1640) and definitions (section 1602) are made applicable to claims under the CLA, because "Congress chose to embed the [CLA] within the TILA structure, . . . general rules of construction applicable in TILA cases must also apply in cases under the [CLA]." *Kedziora v. Citicorp Nat. Services, Inc.*, 780 F.Supp. 516, 519 (N.D.Ill. 1991). Thus the cases cited above are not distinguishable merely because the issues they resolved involved TILA provisions; these cases can be distinguished based on a different reading of the *Milhollin* decision, advocated by the dissent in *Stewart*, which is consistent with the Seventh Circuit's decision in *Highsmith*, namely, that "when a creditor rebates unearned interest at differing rates for . . . separate precipitating causes [*i.e.*, for default rather than voluntary termination], both methods must be disclosed." *Stewart*, 685 F.2d at 394 (Clark, J., dissenting). As Judge Clark argued, the language of the *Milhollin* opinion merely states that "disclosure of [an] acceleration rebate policy [due to default] is only necessary when that policy *varies* from the custom with respect to voluntary [termination] . . . rebates." *Milhollin*,

444 U.S. at 562, 100 S.Ct. at 795 (emphasis added). The Court did not find, despite the language in footnote 8, that an acceleration rebate policy due to default need not be disclosed merely because it resulted in a lower charge than the rebate policy disclosed on the face of the lease, as Citicorp would have us believe. Although the *Stewart* majority and the *Mells* court adopted this view, this Court must follow the principles and rulings enunciated in *Highsmith*, which we believe clearly require a finding that Citicorp's failure to disclose the actuarial method it applied to calculate early termination charges in default cases is a technical disclosure violation under the CLA.

 This decision comports with the underlying policies of TILA and the CLA. For instance, "[c]ourts have consistently held that the ordinary principle of "no harm, no foul" does not limit the availability of TILA remedies under section 1640" and therefore under the CLA, as well. *Kedziora*, 780 F.Supp. at 521. Thus, the fact that an undisclosed rebate policy actually enured to the benefit of a consumer is inconsequential. "[T]he broad remedial purposes of TILA . . . empower[ ] anybody who signs a lease to recover upon proof of nondisclosure in violation of the statute, whether or not the particular nondisclosure produced a demonstrable injury." *Id.* Moreover, the argument that mandatory disclosure does not promote the informed use of credit in cases of involuntary termination (because the consumer cannot foresee the occurrence of these events) simply misses the point.

The issue is whether the method used by the creditor to determine the early termination charge has been fully and accurately disclosed. 15 U.S.C. § 1667a(11). *Highsmith* clarified that the disclosure requirements extend to "*any portion* of the formula" used—even if this undisclosed portion results in a lower charge—and failure to disclose any portion, such as the actuarial method used in this case to discount the early termination charge to present value, "will give rise to a technical violation of the disclosure provision found in 15 U.S.C. § 1667a(11) and Regulation M." 18 F.3d at 439. Citicorp does not dispute that the actuarial method used to

calculate Kedziora's early termination charge was not disclosed in the lease she signed. Citicorp, therefore, is liable for a technical disclosure violation of the CLA, 15 U.S.C. § 1667a(11) and Regulation M.

## B. The Subsequent Occurrence Defense

■ The "subsequent occurrence" defense, argues Citicorp, supports judgment in its favor as a matter of law, as to all but 41 of the class plaintiffs. This defense has its origin in Regulation M, which contains the following provision:

> 213.4(e) *Effect of subsequent occurrence.* If information required to be disclosed in accordance with this regulation is subsequently rendered inaccurate as a result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this regulation.

12 C.F.R. Part 213.4. The Federal Reserve Board's Official Staff Commentary to Regulation M further elaborates on what constitutes a "subsequent occurrence":

> *4(e) Effect of subsequent occurrence.*
>
> 1. *Subsequent occurrences.* Examples of subsequent occurrences include:
>
> * A change from a monthly to a weekly payment schedule.
>
> * The addition of insurance or a security interest by the lessor because the lessee has not performed obligations contracted for in the lease.
>
> * An increase in official fees or taxes. [ ...]
>
> * An increase in insurance premium or coverage caused by a change in law.
>
> * Late delivery of an automobile caused by a strike.
>
> 2. *Redisclosure.* When a disclosure becomes inaccurate because of a subsequent occurrence, the lessor need not make new disclosures unless new disclosures are re-

quired under § 213.4(h) [renegotiations or extensions].

Comm. § 213.4(e).

Citicorp concedes that it applied the disclosed method of calculating rebates (the Rule of 78s) at the time Kedziora signed her lease, but subsequently applied a different rebate policy (the actuarial method) at the time of her default. Citicorp argues, however, that the change in its rebate policy is "most closely analogous" to Staff Commentary example "where a later change in the payment scheduling policy from monthly to weekly renders previously given disclosures inaccurate." Moreover, the change to a "more generous rebate policy" does not constitute a disclosure violation, according to Citicorp, because the change occurred subsequent to the time Kedziora (and the majority of the class members) signed the lease. Finally, Citicorp argues that it was not obligated to give Kedziora new disclosures reflecting the change when the previous disclosures became inaccurate because the change in policy was not a "renegotiation" or "extension" of Kedziora's lease under 12 C.F.R. 213.4(h).

Plaintiffs argue that the "subsequent occurrence" defense does not apply to this case because it covers only those changes which are unforeseen and therefore not culpable under Regulation M § 213.4(a). For instance, in *Douglas v. Beneficial Finance Co.,* 469 F.2d 453 (9th Cir.1972)—a TILA case cited by Citicorp in its favor—the court considered whether a confession of judgment clause should have been disclosed as a security interest under section 1634 of TILA and Regulation Z, section 226.6(g).[2] The appeals court held:

> At the time of the loan, [the creditor] has no means of determining whether the debtor will move and, if he does, whether he will go to a state where judgment without notice or hearing is permissible. An obligor's change of residence is therefore a subsequent occurrence which, under

**2.** Regulation Z § 226.6(g) no longer exists. Its language, however, has been replicated in its entirety in Regulation M § 213.4(e), enacted in 1981 and promulgated after the CLA was enacted in 1976. We can only conclude, therefore,

that the holdings of the following cases, litigated under this section of TILA's Regulation Z, apply with equal force to the CLA Regulation M case before us.

[TILA] and [Regulation Z], does not affect the validity of the original disclosure.

*Id.* at 455.

Similarly, in *Kenney v. Landis Financial Group, Inc.,* 349 F.Supp. 939 (N.D.Iowa 1972), an Iowa district court considered the application of an "early bird" prepayment penalty (calculated by the Rule of 78s) that the creditor had not disclosed in a combined note-disclosure statement. The court held that the creditor's application of this undisclosed penalty was not a "subsequent occurrence" under Regulation Z, section 226.6(g) of TILA, but instead violated the disclosure provisions under section 226.8(b)(6). The court gave no reasons for this decision.

Finally, in *Greer v. GMAC,* 505 F.Supp. 692 (N.D.Ga.1980), the district court considered whether a creditor violated the TILA when it failed to disclose a potential security interest to be taken in unearned insurance premiums. The defendant creditor argued that its failure to disclose was not actionable under the subsequent occurrence doctrine found in Regulation Z, section 226.6(g), because this provision did not operate to cure defects in the creditor's original disclosure statement. The court found for the plaintiff, holding that the "subsequent disclosure" defense "was intended to relieve the creditor from making the full purview of disclosures for every contingency which might arise. It was *not* intended to relieve the creditor from making disclosures required under [TILA]." *Id.* at 694. The Court went on to say that

> [c]ertainly a debtor's default or payment of a loan is a "subsequent occurrence" under section 226.6(g); however, that does not relieve the creditor from disclosing "[t]he amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments." 12 C.F.R. § 226.8(b)(4). Under the defendant's reasoning, section 226.6(g) would relieve the creditor from making these disclosures in the original

disclosure statement. The court cannot agree.

*Id.* at 694.

Citicorp's bottom line is that Regulation M, as its attorneys read it, exonerates its client for any technical disclosure violation that arises subsequent to the time the original disclosures were made. Timing is crucial, Citicorp contends, because "Reg. M and the Commentary clearly recognize that lease obligations can run for a period of years and that consumers and lessors should not be forced to remain in an artificially static relationship," especially where, "months after the disclosures were given, [Citicorp] ... adopted a rebate policy that was more favorable to the consumer."

■ The Court is not persuaded by Citicorp's arguments. We hold that Citicorp's application of an undisclosed rebate method to calculate early termination charges is a violation of the CLA, 15 U.S.C. § 1667a(11), and Regulation M, § 213.4(e). Although the cases cited by both parties,[3] and those found by the Court through its own research, have not uncovered a lucid basis for ruling one way or the other on this issue, we find that the disclosure requirements of the CLA would be undermined by a rule that interprets section 213.4(e) as a creditor's end around section 1667a(11). Unlike the parties, we do not believe that either timing or foreseeability are the keys to interpreting section 213.4(e).[4] Instead, we think a better reading of section 213.4(e) is that "subsequent occurrences" include acts and occurrences that merely render the required disclosures inaccurate, rather than subsequent acts and occurrences that automatically replace material terms or charges which must be affirmatively disclosed under the Act because they constitute a basis of the bargain.

For example, the nondisclosure at issue in this case, unlike those cited as examples in the Reserve Board's Comment, did not merely render the original disclosures inaccurate;

---

**3.** Although each case cited by the parties has not been discussed in this opinion, the Court has reviewed each of these cases and finds that they do not stand for propositions that undermine this Court's interpretation of § 213.4(e).

**4.** However, the court notes that an early termination under the circumstances of this case was eminently foreseeable to Citicorp. What was not foreseeable to Kedziora (and those similarly situated) was that Citicorp would use an undisclosed formula to deal with this foreseeable occurrence.

the application of an undisclosed formula superseded the original disclosure, rendering it obsolete. In this case the lessee defaulted under a lease that disclosed a Rule of 78s method of calculating early termination charges, but an undisclosed actuarial method for calculating the charge was applied instead. The application of the actuarial method resulted in a completely different charge than the one negotiated when the lease was signed. The fact that Citicorp did Kedziora (and every other plaintiff in her position) a favor does not matter. The issue is: was Citicorp's decision to apply an undisclosed formula for calculating early termination charges to Kedziora's lease a "subsequent occurrence" or a technical violation of the Act? The subsequent occurrence, argues Citicorp, was the policy change; due to this policy change, the disclosures on Kedziora's lease became inaccurate. We do not read section 213.4(e) as broadly as Citicorp. In fact,

> [c]ourts have consistently held that TILA (and its implementing regulations) must be liberally construed in the consumer's favor and that even the most technical disclosure violations—whether or not they cause actual damage or deception—may trigger liability for the offending creditor.

*Kedziora*, 780 F.Supp. at 519 (citations omitted). Had a mere address changed, or even a change in the payment schedule been implemented, the basis of the bargain would not be altered because the charge for default would remain the same. Citicorp would therefore not be culpable because the administrative change, although inadvertently rendering the required disclosures inaccurate

could be corrected without new disclosure. The "policy change" in this case, however, warranted a new disclosure, despite Citicorp's contention that section 213.4(h) does not apply, because the change altered the formula Citicorp was required to disclose under section 1667a(11). The subsequent occurrence doctrine simply cannot be used to eliminate the creditors' disclosure obligations under the Act. The Court therefore rejects Citicorp's argument.

The examples of subsequent occurrences, found in the Federal Reserve Board's Official Staff Commentary to Regulation M, support the Court's interpretation. These examples are categorically different than Citicorp's change in policy. The application of an undisclosed formula for calculating a charge, even if it was intended to benefit the Kedzioras, flies in the face of the Act,[5] which requires creditors to act in conformity with the disclosures made at the time the lease (and thus the bargain) was executed, so that the consumer may be fully informed.[6]

■■■■■ The Court therefore finds that the subsequent occurrence defense, on its face and as interpreted in the Federal Reserve Board's Official Staff Commentary, applies to acts, occurrences or agreements outside the scope of the information that section 1667a(11) of the CLA requires the creditor to disclose. The "subsequent occurrence" defense will not operate to exonerate the creditor for its failure to disclose under section 1667a(11), nor may it be used to justify the application of undisclosed formulas that result in a charge not contemplated by the lessee at the time the lease was executed. Conversely, if the subsequent occurrence is a

---

**5.** This finding is consistent with the provision in 12 C.F.R. § 213.4(h), which does not require the creditor to notify lessees of the change unless there is a renegotiation or extension, since the practical effect of this interpretation simply holds the creditor to its word by requiring the creditor to apply the provisions disclosed in the lease, regardless of subsequent changes—even if these provisions result in a more harsh result.

**6.** This interpretation of section 213.4(e) also comports with the principle goal of the Act, namely, to promote consumers' "informed use of credit" by the "meaningful" disclosure of credit charges and terms. 15 U.S.C. § 1601 (1995). *"Meaningful* disclosure [however] does not mean

more disclosure." *Postow v. OBA Federal S & L Ass'n*, 627 F.2d 1370, 1377 (D.C.Cir.1980). We believe our reading of section 1667a(11) and 12 C.F.R. 213.4(e) strikes "a balance between 'competing considerations of complete disclosure ... and the need to avoid ... 'informational overload.'" *Postow*, 627 F.2d at 1377 (citations omitted). In fact, Congress passed TILA to enable creditors "to compare more readily the various credit terms available to [them] ... and to avoid the uninformed use of credit." *Id.* Allowing creditors to apply undisclosed credit terms different than those disclosed in a consumer lease without disclosure simply does not comport with these goals.

change in address, or some change in the terms of the negotiated agreement that merely makes the disclosed information inaccurate (rather than replacing it with new undisclosed information), the subsequent occurrence defense applies. The relevant distinction rests on an assessment of whether the subsequent occurrence would have altered the rational decisionmaking of the consumer at the time the lease was signed. If the occurrence merely requires correction to the lease, rather than revision or amendment, the subsequent occurrence will not operate as a basis for liability. If the subsequent occurrence renders the original disclosures obsolete, then section 1667a(11) is violated.

## C. Damages

■ The only remaining issue, therefore, concerns damages. Damages for violations of the CLA section 1667a are governed by TILA section 1640. 15 U.S.C. § 1667d. TILA section 1640 provides for an award of actual damages (if any) and statutory damages which "shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor." 15 U.S.C. § 1640(a). As of June 1995, Citicorp's net worth was $37,699,073. The maximum statutory damages award in this case is therefore approximately $376,990.

■ The Court must consider five factors in calculating a statutory damages award under section 1640: (1) the amount of any actual damages; (2) the frequency and persistence of non-compliance; (3) the resources of the creditor; (4) the number of persons adversely affected; and (5) the extent to which the creditor's failure to comply was intentional. 15 U.S.C. § 1640. Application of these factors in this case results in a finding that only nominal statutory damages are appropriate.

### 1. Actual Damages & Number of Persons Adversely Affected

First, Kedziora and the class suffered no actual damages from Citicorp's rebate practice because the actuarial method applied to them resulted in a lower termination charge than the one disclosed on the lease. There is simply no evidence that plaintiffs, relying on the disclosure, were adversely affected because they purchased unnecessary insurance to pay for the early termination charge disclosed in the lease. Moreover, the fourth factor—the number of persons adversely affected by the violation—(376 total members in the class) is not high enough in this case to warrant a significant award.

### 2. Frequency and Persistence of Non-compliance

The second factor does not support a large statutory award either. Citicorp's technical disclosure violation, although it affected 41 people who executed the same lease form as Kedziora after December 31, 1989, cannot be characterized as "frequent" since only 41 people were affected by the change. The issue of whether the violation was "persistent," however, is not easily ascertainable. Citicorp argues that it changed its lease form and its insured total loss unearned lease charge rebate method effective July 1, 1990, and thus "within months" of its December 31, 1989, change to the actuarial method. The new lease forms, however, did not disclose that Citicorp would calculate the rebate for insurance total loss lessees using the actuarial or the Rule of 78s, whichever resulted in a greater benefit to the lessee. The leases merely stated, like their predecessors, that the unearned amount of the lease charge would be determined by the Sum of the Digits method (i.e., the Rule of 78s) and by the amount of any sales. These leases therefore did not disclose application of an actuarial method. Whether this disclosure violation was "persistent," therefore, must be measured by the time between the change in policy and the date that Citicorp ceased buying consumer leases, February 28, 1991. Fourteen months is a fairly long time to apply an undisclosed rebate method, however, this factor alone, even if characterized as "persistent," does not weigh heavily enough in favor of a large award, given the other factors in this case.

This finding is supported by the decision reached in *Postow v. OBA Federal Savings & Loan Ass'n,* 627 F.2d 1370 (D.C.Cir.1980), where the D.C.Circuit noted that the fre-

quency of a TILA violation is less important where the defendant did not willfully persist in disclosure violations after it knew that they were proscribed by statute. *Postow,* 627 F.2d at 1385. The *Postow* court also found that a large statutory award would not deter future disclosure violations where the defendant was no longer violating the Act.

In this case, there is no evidence that Citicorp "willfully" persisted in its application of an undisclosed rebate policy, knowing that these violations were proscribed by statute, after the first quarter of 1990. It is undisputed, however, that Citicorp allowed the disclosure violation to go unremedied for at least several months, if not for over a year, thereby giving the 41 lessees who did sign forms with undisclosed rebate practices standing to sue for this technical violation which carries with it the penalty of statutory damages. A large statutory award, however, is unnecessary because it is undisputed that Citicorp is no longer violating the Act.

### 3. Intent

Finally, there is no evidence that Citicorp's "failure to comply" with the section 1667a(11) disclosure requirement was "intentional" under the fifth factor. The original disclosures in Kedziora's lease were accurate when given, and there is no evidence that Citicorp "intended" or was otherwise willfully in violation of the Act when the 41 class members who actually signed leases between December 31, 1989 (the date Citicorp began calculating the rebate using an actuarial method) and the date Citicorp ceased buying consumer automobile leases. Without such evidence, the Court is unwilling to calculate the award based on this factor.

### 4. Calculations

 The question in this case has thus become "how much" should the award be, especially given that the plaintiffs affected by the violation suffered no actual harm but instead actually benefitted from the application of an undisclosed actuarial rather than a disclosed Rule of 78s method. Implicit considerations of equity play a part in this analysis, despite the fact that the determination of liability and damages under the CLA for a technical disclosure violation are largely controlled by statute.

Citicorp's position is that "[s]ection 1640 provides that there is *no minimum statutory recovery* in a class action. 15 U.S.C. § 1640(a)(2)(b). In an individual action, however, the minimum statutory award is $100. 15 U.S.C. § 1640(a)(2)(A)(i)." Citicorp urges this Court to adopt the minimum statutory amount for individual actions in this class action, as the D.C.Circuit did in *Postow.*

The plaintiffs' primary position is that this case is factually distinct from *Postow* because the five factors listed above weigh in favor of a full statutory award, or $376,990. The Court has already rejected that position. The plaintiffs' alternative position is that the *Postow* court did not consider whether a plaintiff in an individual CLA case is entitled to statutory damages equaling "25 per centum of the total amount of monthly payments under the lease." 15 U.S.C. § 1640(a)(1), (2)(A)(ii). Plaintiffs contend that, in this case, that formula would put the minimum recovery at about $1,000 per plaintiff.

 After reading *Postow* and the relevant statutory provisions, it is this Court's view that $100 per plaintiff is an proper amount under section 1640. First, $1000 in an individual action is a ceiling not a floor. 15 U.S.C. § 1640(a)(2)(A). Second, there is no minimum statutory recovery for class actions, 15 U.S.C. § 1640(a)(2)(B), and thus the adoption of the individual action minimum is permitted. *Postow,* 627 F.2d at 1384. Adopting this measure and multiplying it times the number of class members remaining in this case (approx. 376) brings the total amount of damages awardable in this case to $37,600. That number, however, does not end the Court's inquiry.

### D. Defensive Set–Off

 By definition, statutory damages may be awarded without regard to whether the plaintiff suffered actual damage, *Postow,* 627 F.2d at 1384, since "the purpose of the Act's civil remedies provisions is 'to provide a meaningful incentive to comply with the law....'" *Id.* (citation omitted). Thus, section 1640 is known as a penalty that imposes

damages determined according to the culpability of a particular defendant by use of a five factor test. *Id.* at 1384–85. As a penalty, the amount of a damage award is intended to serve as a deterrent.

The final question in this case is whether a defensive set-off for the amounts that the individual class members still owe Citicorp for early termination charges due to default would undermine the deterrent effect of the damage award under section 1640. After consideration of the cases and policy arguments advanced by the parties, this Court finds that a defensive set-off is entirely proper and equitable in this case. *See Binnick v. Avco Financial Services of Nebraska, Inc.,* 435 F.Supp. 359, 365 (D.Neb.1977) (use of a defensive setoff "has been specifically recognized in the context of a defensive setoff for an amount due on a note in the face of a plaintiff's TILA suit"); *Goldstein Oil Co. v. J.M. Sweeney Co.,* 1985 WL 1725 (N.D.Ill. 1985) ("[a]n exception exists to the rule that a permissive counterclaim must have an independent jurisdictional basis when the counterclaim seeks a defensive setoff for a liquidated or otherwise ascertained amount, pled solely to diminish or reduce the plaintiff's judgment."). *See generally Olevares v. Viking Dodge, Inc.,* 626 F.Supp. 114, 117 (N.D.Ill.1985) (indicating in dicta that "while [defendant's state law] claim was not compulsory, it could have raised its claim as a setoff to plaintiffs' TILA claim in the course of our adjudication"). The Court therefore grants Citicorp's motion for leave to amend its affirmative defenses to replead its counterclaim as a defensive setoff.

█ Citicorp claims that it is entitled to a defensive set-off, calculated by the amount that Kedziora and the other class members owe Citicorp for unpaid termination charges, or $191,025.60 owed by the 80 class members who have paid no part of their early termination charge and the $53,718.55 owed by 38 class members who have made only partial payment.[7] Although the Court has denied Citicorp's right to claim these amounts in a permissive counterclaim against the class,

these amounts can be used as a defensive set-off against the award calculated above. 6 C. Wright, A. Miller, Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE, § 1422 at 175 (1990). A defensive set-off, unlike a permissive counterclaim, "does not need independent jurisdictional grounds even though the claim is unconnected with the transaction or occurrence on which the main claim is based." *Id.* at 175–76 (citing cases). As argued by Wright and Miller, taking jurisdiction over the defensive set-off "promote[s]" the general federal policy against multiplicity of actions and would not result in a substantial extension of federal subject matter jurisdiction. *Id.* at 177. Allowing the set-off in a case involving the CLA, where the damage award is intended to penalize and deter future violations, does not undermine the goals of the Act simply because the effect of the set-off, in comparison to the amount of the award, eliminates the need for Citicorp to pay money for its violation. The decision in this case, acknowledging the violation and awarding a sum, is a deterrent, even if the ultimate monetary result in this case amounts to a draw for both parties, with neither party reaping any monetary rewards for their fierce litigation efforts.

## IV. Conclusion

In the Court's view, the fact that neither party takes home any money is an ironic and surprisingly equitable result given the nature of this case: a technical violation that caused no actual harm and in fact enured to the benefit of the class members'—whose attorney did not even recognize the successful claim until two sets of summary judgment motions had been filed, *Highsmith* had been issued, and the case had been reassigned to this Court's calendar.

█ Although the issue of attorneys fees and costs still looms on the horizon under section 1640(a)(3), attorneys fees are limited, by statute, to successfully litigated claims. The eleven claims asserted by plaintiff that

---

7. These figures have been taken from the submissions filed by Citicorp in its Response to Plaintiffs' Motion to Dismiss the Counterclaims. If the amounts vary from these figures, Citicorp's counsel is invited to resubmit the proper figures to this Court in a Motion to Amend.

were dismissed by Judge Shadur and this Court during the course of this four year litigation effort are not compensable under the CLA or under the American Rule. Thus, the fee petition this Court invites plaintiffs' counsel to submit should cover only those efforts made to file the Fourth Amended Complaint and to pursue summary judgment on the sole claim asserted therein. As required by statute, this court will award "reasonable attorney's fee[s]" and costs for the successful claim asserted in the Fourth Amended Complaint, and no more. 15 U.S.C. § 1640(a)(3) (1995).

This having been said, the Court directs the Clerk of the Court to grant Citicorp's Motion for Leave to Amend, so that it may assert its former counterclaims as a defensive setoff. The Court (happily) also directs the Clerk of the Court to enter a final judgment in this case.[8] This judgment should be entered in favor of the plaintiffs on the sole claim alleged in the Fourth Amended Complaint in the amount of $37,600, set-off by the amounts still due and owing to Citicorp by Kedziora and the class members.[9] Because the past due amounts exceed the amount of the award under section 1640, this set-off effectively results in a judgment of zero dollars. Plaintiffs have fourteen (14) days to file a Petition for Attorneys Fees. Defendant will have seven (7) days to file a response. The Court will rule by mail. This case is TERMINATED.

---

8. The Court retains jurisdiction to consider a fee petition may in a civil case even after a final judgment has been entered.

9. Dismissal of Citicorp's counterclaims means that the amounts in excess of the judgment for plaintiffs cannot be recovered by Citicorp.