Merrilou **CHANNELL**, formerly known as Merrilou Kedziora, on behalf of a class of persons who leased automobiles, Plaintiff–Appellant, Cross–Appellee,

v.

**CITICORP NATIONAL SERVICES, INC.,** formerly known as Citicorp Acceptance Co., Defendant–Appellee, Cross–Appellant.

Nos. 95–3609, 95–3700.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1996.

Decided July 11, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 9, 1996.*

---

* Judge Cummings took no part in consideration of the suggestion for rehearing en banc.

Lawrence Walner, James B. Goldberg, Walner & Associates, Chicago, IL, Daniel A. Edelman (argued), Cathleen M. Combs, J. Eric VanderArend, James O. Latturner, Charles E. Petit, Edelman & Combs, Chicago, IL, Lisa I. Vessey, Chicago, IL, Francine Schwartz, Arlington Heights, IL, for Plaintiff-Appellant in No. 95–3609.

James C. Schroeder, Lynne M. Raimondo, Terri A. Mazur (argued), Alan N. Salpeter, Victoria R. Collado, Mayer, Brown & Platt, Chicago, IL, for Defendant-Appellee in both cases.

Lawrence Walner, Walner & Associates, Chicago, IL, Daniel A. Edelman (argued), Cathleen M. Combs, J. Eric VanderArend, Edelman & Combs, Chicago, IL, Lisa I. Vessey, Chicago, IL, Francine Schwartz, Arlington Heights, IL, for Plaintiff-Appellant in No. 95–3700.

Before EASTERBROOK, RIPPLE, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

This case under the Consumer Leasing Act, 15 U.S.C. §§ 1667–1667e, presents three questions. First, must a lessor that uses the sum-of-the-digits method (also known as the Rule of 78s) to calculate unearned interest explain what the method entails? Second, after disclosing that it will use the Rule of 78s, must the lessor actually use it? Third, may a district court use the supplemental jurisdiction, 28 U.S.C. § 1367, to order members of a plaintiff class (which becomes a defendant class in a counterclaim) to pay what they owe on consumer leases?

The class certified in this case comprises persons whose automobile leases have been assigned to Citicorp National Services and

terminated before expiration. A subclass includes lessees whose terminations were involuntary. Merrilou Channell (and her former husband Thomas Kedziora) represent both the class and the subclass. Their leased automobile was destroyed in a collision, an event the lease treats as an early termination. The lease provides for an early termination charge computed as

> the sum of: (a) all unpaid amounts then due under this Lease, (b) all remaining Monthly Payments due after the date I terminate this Lease reduced by the unearned amount of the Lease Charge (Item 28(a)) determined by the Sum–of–the–Digits method, and by the total amount of any sales, use or rental tax (shown in item 24) for those Monthly Payments, (c) an amount equal to any disposition charge shown in Item 27, (d) the Estimated End of Term Wholesale Value of Vehicle shown in item 28, and (e) any government fees and taxes in connection with early termination of this Lease.

After the car was wrecked 23 months into a 60 month lease, Citicorp calculated an early termination charge of $12,994.14. The Kedzioras signed their insurance proceeds of $10,360 over to Citicorp, leaving a balance of $2,688.14. Instead of paying, they filed this suit under the Consumer Leasing Act, contending that Citicorp had violated the Act. Judge Shadur held that referring to the Rule of 78s by name satisfies both the Act and the regulatory requirement that the lease state "conditions under which the lessee or lessor may terminate the lease prior to the end of the lease term and the amount or method of determining the amount of any penalty or other charge for early termination." 12 C.F.R. § 213.4(g)(12). See 780 F.Supp. 516 (1991); 844 F.Supp. 1289 (1994). Judge Shadur also disposed of numerous other contentions that plaintiffs have since dropped. The case then was transferred to Judge Castillo, who concluded that Citicorp violated the Act by using a method other than the Rule of 78s when the termination is involuntary—even though the method Citicorp actually used is more favorable to lessees. 883 F.Supp. 1155 (1995). This led to judgment in Citicorp's favor with respect to the principal class, but a judgment in favor of the subclass that Judge Castillo fixed at $100 per vehicle. 901 F.Supp. 1321 (1995). Judge Castillo then rebuffed Citicorp's demand for judgment on the balance due under the leases. After holding that it lacks jurisdiction over Citicorp's claims based on the contract, the court entered a final judgment giving each class member a credit of $100 in any later collection action. Citicorp is required to write checks only to subclass members who have paid their termination charges in full.

■ Plaintiffs' principal argument is that a reference to "the Sum–of–the–Digits method" is incomprehensible to an average consumer and therefore violates the requirement that disclosures be clear and conspicuous. 12 C.F.R. § 213.4(a)(1). (This is part of the Federal Reserve Board's Regulation M. The Board has established the operative disclosure requirements using power delegated by 15 U.S.C. § 1604 and § 1667a; the latter statute contains an independent clarity requirement.) Part (b) of the termination clause in the lease requires the lessee to remit all of the scheduled monthly payments, less the portion of those payments that represents interest on the amounts implicitly loaned to finance the transaction. The implicit interest is "unearned" because the lessee pays the balance at the time of termination, when the loan ends. The lease names a method of determining which portion of the monthly payments represents unearned interest, but only a rare consumer would know what it means. Citicorp replies with a confession and avoidance: it allows that "the Sum–of–the–Digits method" could be right out of Jabberwocky so far as the normal consumer is concerned, but it contends that the regulatory requirement is met by giving the *name* of a method rather than the *details* of a method. Section 213.4(g)(12) says that the lease must contain the "amount *or method of determining the amount* of any penalty or other charge for early termination" (emphasis added). The statute itself uses a similar formula: "the amount or method of determining any penalty or other charge for . . . early termination." 15 U.S.C. § 1667a(11). The Rule of 78s is the "method of determining the amount" due; and Citicorp's use of

this method, as opposed to some other method, is disclosed clearly and conspicuously.

■ The district court held that only the method, and not the way the method works, needs to be disclosed. It is hard to read the statute and regulation any other way. "Clear and conspicuous manner"—the language of § 1667a-means *visible*, not *simple*. "Manner" refers to the mode of presentation, not the degree of comprehension. The Act and Regulation M do not define "clear and conspicuous," but the words are staples of commercial law. The Uniform Commercial Code defines "conspicuous" as "so written that a reasonable person against whom it is to operate ought to have noticed it." UCC § 1–201(10). A disclaimer of the warranty of merchantability is enforceable if conspicuous, see UCC § 2–316(2), even if the average consumer hasn't the vaguest idea what a "warranty of merchantability" entails. Regulation M calls for the use of 10–point type at a minimum. 12 C.F.R. § 213.4(a)(1). At all events, it is not clear why we would *want* to read Regulation M as plaintiffs do, even if we could. Some states now require lenders and lessors to spell out the details. Here is what Illinois requires lenders to tell consumers in loan agreements:

> Unearned finance charges under the Rule of 78ths are computed by calculating for all fully unexpired monthly installment payments, as originally scheduled or deferred, which follow the day of payment, the portion of the precomputed interest that bears the same ratio to the total precomputed interest as the balances scheduled to be outstanding during that monthly installment period bear to the sum of all scheduled monthly outstanding balances originally contracted for.

205 ILCS 670/16(m). Just how is *that* going to help the average consumer? A beneficial set of disclosure rules gives the consumer information that can be put to use, while withholding technical information that distracts attention from the rest of the disclosures—as the Supreme Court pointed out in addressing a parallel question under the Truth in Lending Act, too much information ("information overload") can be as bad as too little. *Ford Motor Credit Co. v. Milhollin,*

444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980). Recitation of indigestible matters can make it hard for consumers to find what they really care about. Cf. *Todd v. Societe BIC, S.A.,* 9 F.3d 1216, 1218–19 (7th Cir.1993) (en banc). Reference to the Rule of 78s without further elaboration enables consumers to engage in comparison shopping: if most lessors use that method of computing unearned interest, then consumers can ignore it and compare the price terms. And of course lessors who offer more favorable terms can explain to consumers why their approach is better.

How much information is optimal can be a nice question, on which, fortunately, we need not reach an independent conclusion. The Federal Reserve has the leading role, and Regulation M says that the lessor may disclose either the amount or the method of getting to an amount. Plaintiffs want Citicorp to give a set of examples that would help consumers understand how the rule works; indeed, plaintiffs really want Citicorp to give a table of amounts ("if you terminate in month 13, you owe us $x; if you terminate in month 14, you owe us $y ..."). Disclosures of amounts would satisfy the regulation. But so do disclosures of methods, such as the Rule of 78s, and we are not authorized to withdraw that option from lenders just because we think that tables of amounts, or mathematical formulae, would be more readily understood.

The Federal Reserve has a thorough revision of Regulation M under consideration. Published for comment last year, the revisions would make it clear that Citicorp took an appropriate course:

> [G]iven the complexity of the methods involved, a lessor is permitted—in giving the full description of its early termination method—to include a reference to the name of a generally accepted method of computing the unamortized gross or capitalized cost (also known as the "adjusted lease balance") portion of its early termination charge.

60 Fed.Reg. 48752, 48756 (Sept. 20, 1995). The commentary adds that "if a lessor refers to a named method in this manner, it would have to provide a written explanation of that

method if requested by the consumer." *Ibid.* To that extent the new rule, if adopted, would change the law. But it would not change the law retroactively, see *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), and in any event Merrilou Channell does not contend that she, or any other member of the class, asked for and was denied an explanation.

The treatment of unearned interest under the Truth in Lending Act, a similar law, supports Citicorp. Until 1980 the TILA, like the Consumer Leasing Act, required the lender to disclose the amount or method of determining what is due if the borrower pays early. The Federal Reserve issued a regulation authorizing lenders to refer to the Rule of 78s by name, without further explanation. 12 C.F.R. § 226.818(c) (1980). That year Congress amended the TILA to eliminate any obligation for lenders to identify the method of determining the calculation method, and the Board followed suit: the Board concluded that "[w]here there is a precomputed finance charge, the creditor must disclose whether or not the consumer will receive a rebate . . . [but] the method of rebate need not be named." 45 Fed.Reg. 29702, 29725 (May 5, 1980) (commentary on the deletion of the regulatory disclosure requirement). A reference in a lease to the sum-of-the-digits method is not highly informative, but it is more than the Board requires in loan transactions.

Plaintiffs rely primarily on *Lundquist v. Security Pacific Automotive Financial Services Corp.,* 993 F.2d 11 (2d Cir.1993), which they say establishes that reference to the "constant yield basis" in a lease does not comply with the Act and Regulation M. We confess to substantial difficulty deciphering the opinion in *Lundquist.* After setting out three clauses of the lease (one of which included the words "constant yield basis"), the second circuit stated:

> [W]e agree with the district court that the Security Pacific lease disclosures are not reasonably understandable. They are "confusing, unduly complicated, and unnecessarily convoluted." In particular, the termination formula in Item 16(c) of the

lease is a Byzantine formula, beyond the understanding of the average consumer.

993 F.2d at 15. That is the entire discussion, and it neither points to "constant yield basis" as problematic nor discusses the lease's shortcomings. The court does not explain why the operation of a formula must be simple—for the Act requires a clear presentation but does not limit the number of variables the lessor may consider. The quoted words "confusing, unduly complicated, and unnecessarily convoluted" lack a source— they are not quoted *from* anything, and a search of a database containing all federal opinions of the last 50 years did not turn up any other uses of that phrase. It does not appear anywhere in the United States Code or the Code of Federal Regulations. For current purposes, it is enough to say·that *Lundquist* does not analyze or address the question whether the Act and Regulation M permit a lessor to name a method without providing an elaboration of the method's operation. We hold that it does.

█ A subclass of 377 members has a stronger argument: although Citicorp said that it would use the Rule of 78s, it didn't. Since 1990 Citicorp has used the actuarial method (an exact calculation) to determine unearned interest when the lessee experiences an insured total loss of the vehicle. Relying on *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434 (7th Cir.1994), the district court held that the disparity between the method disclosed and the method applied violates the Act and requires a penalty, which the judge set at $100 per lease, the lowest sum allowed by the statute. 15 U.S.C. § 1667d(a), incorporating 15 U.S.C. § 1640(a)(2)(ii). *Highsmith* directly supports the decision; it holds that a disclosure is deficient if the lessor does something else, even if that something else is more favorable to the lessee. Lessors must disclose what they do in fact. Practical as well as formal considerations support that conclusion. Suppose the lease states that there will be a penalty of $5,000 on early termination, but the lessor actually charges only $500. A lessee considering whether to turn the car back early and buy a newer model may look at the lease and be dissuaded, although if he

knew the actual consequences of the decision he would act differently.

■ Citicorp does not try to distinguish *Highsmith* on the ground that the class members' terminations were involuntary, and that the termination clause of the lease could not have influenced whether they drove carefully or carelessly. Compliance with the Act and Regulation M is determined *ex ante* rather than *ex post*. Instead Citicorp argues that the disclosure was accurate when the Kedzioras signed their lease, and that it later changed its policy. This response fails on its own terms for 41 members of the subclass, who signed their leases after December 31, 1989, and received information that Citicorp concedes was inaccurate. It is not a good reply for the other 336 subclass members, either. Citicorp treats the terms of leases as "policies" that it is entitled to change, but one party to a contract may not unilaterally alter its terms. Citicorp could choose not to *enforce* a right it held under the contract— but that sends us back to *Highsmith* unless the lessor notifies the lessees, so that they know the actual consequences of exercising particular options under the lease.

One part of Regulation M that *Highsmith* did not discuss provides at least superficial support for Citicorp's position. Section 213.4(e) reads:

> If information required to be disclosed in accordance with this regulation is subsequently rendered inaccurate as a result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this regulation.

Citicorp's change to the actuarial method is not an "agreement" with the lessees. In lay parlance it could be thought an "act" or "occurrence," but we doubt that the Federal Reserve meant to give lessors the power to change terms at will, which would make the disclosures pointless. Examples in the staff commentary on this provision cover such things as subsequent changes in law (higher taxes, for example, collected under a clause making the lessee responsible for taxes) or events the lessor cannot foresee (such as strikes that prevent timely delivery). *Doug-las v. Beneficial Finance Co.*, 469 F.2d 453 (9th Cir.1972), generalizes this to a rule that the act or occurrence must be something beyond the lender's control, a step that seems to us essential to make the disclosures informative. Citicorp was not compelled by legislation or the unanticipated acts of any third party to alter its termination formula. If it wanted to change the consequences of early termination, it had to follow the third option in § 213.4(e): "agreement". It did not do so, even by sending notice inviting the lessees to give assent by silence.

■ After Citicorp found itself facing a class of lessees who terminated their leases early, it filed a counterclaim seeking a judgment for the contractual termination payments. When notifying class members of the litigation, the district court told them that they could end up being held liable under their contracts for more than they stood to win under the Consumer Leasing Act. Some class members opted out; Citicorp wants deficiency judgments against those who remain. Setting aside Judge Shadur's initial conclusion that the court had jurisdiction over the counterclaim, Judge Castillo held that the complete-diversity requirement of *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), and the jurisdictional minimum of $50,000 per claim, prevent the entry of judgments for the lessor. 1995 WL 506061.

The class's suit rests on the federal-question jurisdiction of 28 U.S.C. § 1331. Until recently it was clear that a permissive counterclaim based on state law requires an independent basis of jurisdiction, *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974); *Unique Concepts, Inc. v. Manuel*, 930 F.2d 573, 574 (7th Cir.1991), which Citicorp cannot invoke because some of the class members are not of diverse citizenship from Citicorp, and each deficiency is less than $50,000. See also *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). *Valencia v. Anderson Bros. Ford*, 617 F.2d 1278, 1289–90 (7th Cir. 1980), reversed on other grounds, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981), holds that an attempt to collect the balance

on a consumer loan is a permissive rather than a compulsory counterclaim to a suit under the Truth in Lending Act. Judge Castillo concluded that a counterclaim for the balance of a consumer lease likewise is permissive rather than compulsory, which, coupled with the holding that 28 U.S.C. § 1367 does not enlarge the federal courts' jurisdiction, led him to dismiss the counterclaim.

Now the jurisdictional distinction between permissive and compulsory counterclaims was developed before Congress enacted 28 U.S.C. § 1367 to codify, and to an extent extend, the supplemental jurisdiction (formerly known as the pendent jurisdiction). Section 1367(a) says that district courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within [the] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Judge Castillo gave two principal reasons for holding that § 1367 does not authorize adjudication of Citicorp's counterclaim. First, he observed that we repeated the permissive-compulsory distinction in *Unique Concepts*, which was decided after the enactment of § 1367. Although that statute applies only to cases commenced after December 1, 1990, rendering it inapplicable in *Unique Concepts* (which began in 1985), the district judge thought that our use of the phrase supplemental jurisdiction "indicates that *Unique Concepts* was meant to apply to both pre- and post-Section 1367 cases." Second, the district judge concluded that § 1367 codifies jurisdictional principles existing in 1990, including the distinction between permissive and compulsory counterclaims.

The first of these conclusions reads too much into *Unique Concepts*. The panel observed that § 1367 had changed nomenclature, but it did not analyze the effect of § 1367 because the statute was inapplicable. Courts do not anticipate jurisdictional questions, and certainly do not resolve them without discussion just by using the latest terminology. The second conclusion finds support in decisions of several other district judges, but is inconsistent with opinions of this court after Judge Castillo entered his final judg-

ment. For example, *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928 (7th Cir.1996), holds that § 1367 supersedes *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939), and permits the district court to entertain an action against a pendent party even though the plaintiff's claim against that party does not exceed $50,000. *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176 (7th Cir. 1993), had earlier held that § 1367(a) permits the adjudication of a claim by a pendent party that neither arises under federal law nor is supported by diversity of citizenship, implying that *Strawbridge* has been curtailed for cases within the scope of § 1367. In *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1298–1301 (7th Cir.1995), we concluded that § 1367 has extended the scope of supplemental jurisdiction, as the statute's language says, to the limits of Article III—which means that "[a] loose factual connection between the claims" can be enough, quoting from *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir.1995).

The distinction between permissive and compulsory counterclaims served an important function when every assertion of pendent jurisdiction was of doubtful propriety, because not supported by statute, but in which the law of preclusion *required* compulsory counterclaims to be presented or lost. (That's why they are called compulsory. No one has to make a "compulsory" counterclaim, but it is lost if not presented.) Refusal to entertain a compulsory counterclaim might lead to its forfeiture. Refusal to entertain a permissive counterclaim did not create such a risk—while hearing the counterclaim could exceed the powers granted to a court of limited jurisdiction. Now that Congress has codified the supplemental jurisdiction in § 1367(a), courts should use the language of the statute to define the extent of their powers.

*Baer* and *Stromberg Metal Works* show that there is no difficulty in adjudicating claims based on the leases. Each class member's claim against Citicorp depends on the lease, and indeed on the same *clause* of the lease that creates Citicorp's claim for a termination charge. The acts creating the

claims differ—the claims against Citicorp stem from the signing of the lease, while the claims against the class stem from the early termination of the lease. But the parties, the lease, the clause, and even the terminations are constants—recall that the reason the district court ruled in favor of the subclass is that after the early termination of some leases Citicorp used the actuarial rather than the sum-of-the-digits method of computing unearned interest. Signing and termination alike therefore were integral to this case even before Citicorp launched its counterclaim, and these events are at least as closely related as the claims that *Baer* and *Stromberg Metal Works* held to be a single case or controversy. By providing that the $100 award in favor of each subclass member need not be paid, but could be set off against sums due to Citicorp under the leases, the district court essentially acknowledged as much.

That a counterclaim falls within the outer boundary of § 1367(a) is not the end of matters, however. Section 1367(b) establishes important limits for suits in which the initial claim rests on diversity of citizenship, although these do not apply to our case, which began under the federal-question jurisdiction. Section 1367(c) authorizes district courts to decline to exercise supplemental jurisdiction in four situations, two of which may apply here:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> .      .      .      .      .      .
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
>
> .      .      .      .      .
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

■ Plaintiffs contend—presumably invoking § 1367(c)(4), though they do not discuss it—that a court should not entertain a counterclaim on the lease because the threat of an adverse judgment would unduly discourage enforcement of the Consumer Leasing Act. In making this argument, counsel appears to assume that the two options are: (a) lessees recover under the Act and never pay their debts under the lease; and (b) lessees recover under the Act and are ordered in the counterclaim to pay their debts. Option (a) certainly does more to encourage suits that enforce the Act, but the inducement comes entirely from avoidance of the debts under the leases, which is not the inducement Congress established in the Act. Plaintiffs cannot expect a court to tolerate evasion of lawful debts, or to use the fact that case-by-case enforcement is expensive to lessors (perhaps too expensive to justify independent legal action) to bestow on lessees a legal right to avoid collection. Option (a) is out of bounds. Courts must elect among: (b) lessees recover under the Act and are ordered in the counterclaim to pay their debts; (c) lessees recover under the Act but only as an offset to collection by the lessor in independent actions; and (d) lessees recover cash under the Act, leaving the lessor to file independent actions for the whole debt. Of these, (d) would most strongly promote enforcement, but the district court selected option (c) without protest on appeal by the plaintiffs. Option (b) would be equally proper and might even be preferable from lessees' perspective. Lessors extend credit (this is what long-term auto leases effectively are) only when the returns equal or exceed what they can earn by investing money elsewhere. Debts that must be written off, and legal expenses of collection, are part of the cost of credit and ultimately are paid by lessees. Legal rules that increase collections and reduce expenses may require *these* lessees to pay more, but the cost of leases will fall for consumers as a group—for in competition any reduction in costs flows to consumers. Consideration of consumers' interests therefore favors adjudicating rather than dismissing Citicorp's counterclaim.

Consideration of other litigants' interests may cut the other way. Calculation of the sum due under each lease, and adjudication of defenses specific to particular lessees, may be considerably more time consuming than the adjudication of the class's claims under the Act. This would divert time from litigants in other cases patiently waiting in the queue for the limited time of federal judges.

To put this in the statutory language: Citicorp's counterclaim may "substantially predominate[ ] over the claim or claims over which the district court has original jurisdiction". 28 U.S.C. § 1367(c)(2). Then there is § 1367(c)(4): "exceptional" circumstances that provide "compelling" reasons to decline supplemental jurisdiction. Citicorp's counterclaim recasts this case as a defendant class action for damages, which although not unheard-of is certainly "exceptional." We held in *Henson v. East Lincoln Township*, 814 F.2d 410 (7th Cir.1987), that the lack of an opt-out right for class actions under Fed. R.Civ.P. 23(b)(2) means that classes cannot be defendants under that subsection. *Henson* implied, as other courts have held, that when class members are given the right to opt out (as members of the class in this case were), it is *possible* to enter a money judgment against a class. Possible, but exceptional; and perhaps the difficulties of administering this case as a defendant class action amount to a "compelling" argument for relinquishing jurisdiction. Yet a judge also might think that the benefits of consolidated adjudication, compared with thousands of suits scattered throughout the nation, justify the time needed to address the counterclaim. It may turn out that entry of judgment on the counterclaim requires little more than a mechanical calculation; if so, § 1367(c) would not justify relinquishing jurisdiction.

Arguments under § 1367(c) are addressed to the district court's discretion. Because he held that § 1367(a) did not authorize the exercise of supplemental jurisdiction, Judge Castillo did not exercise the discretion § 1367(c) confers. It belongs to him rather than to us, so we remand for its exercise. The judgment on the plaintiff class's claims is affirmed. The judgment dismissing Citicorp's counterclaim is vacated, and the case is remanded for proceedings consistent with this opinion.